UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA RUPCICH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-6615 |
| | ) | Judge John Z. Lee |
| UNITED FOOD and COMMERCIAL | ) | |
| WORKERS INTERNATIONAL UNION, | ) | |
| LOCAL 881, and JEWEL FOOD STORES, | ) | |
| INC. | ) | |
| | ) | |
| | ) | Jury Trial Demanded |
| Defendants. | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, WRONGFUL TERMINATION, BREACH OF LABOR UNION'S DUTY OF FAIR REPRESENTATION, AND DEFAMATION PER SE

NOW COMES the Plaintiff, Patricia Rupcich (hereinafter "Plaintiff"), by and through her

attorneys at the Law Firm of Neal C. Zazove & Associates, P.C. and in complaint against the

Defendants United Food and Commercial Workers International Union Local 881, and Jewel

Food Stores, Inc., (collectively, hereinafter "Defendants"), states as follows:

### Nature of Action

1.      This action arises out of a violation of contracts between an employer and a labor

organization representing employees in an industry affecting commerce, pursuant to

29 U.S.C.A. § 185; *see also Vaca v. Sipes*, 87 S.Ct. 903 (1967).

### Jurisdiction and Venue

2.      Venue lies in the Northern District of Illinois in that the Plaintiff is a citizen of

Illinois, Plaintiff is a resident of this District, and the Defendants are doing business

in this District. In addition, the Defendant United Food and Commercial Workers

1

International Union, Local 881's duly authorized officers or agents are engaged in representing or acting for its employee members in this District.

3.　　This action arises out of a violation of contracts pursuant to 29 U.S.C.A. § 185, of which a copy of the Collective Bargaining Agreement entitled Local 881 UFCW Contract 2010-2013, Jewel Food Stores, Inc. Chicagoland, is attached and incorporated herein as Exhibit A.

4.　　This court has supplemental jurisdiction over Plaintiff's claim for defamation per se pursuant to 28 U.S.C.A. §1367(a), as the claim is so related to claims in the action within original federal jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

## Jury Demand

5.　　Plaintiff demands a trial by jury.

## Parties

6.　　Plaintiff is an individual residing in Thornton, Illinois and began employment with Defendant Jewel Food Stores, Inc. (hereinafter "Jewel") on November 2, 1986.

7.　　Jewel is a foreign corporation, incorporated in the State of Ohio and doing business in the State of Illinois.

8.　　Defendant United Food and Commercial Workers International Union, Local 881 (hereinafter "UFCW 881") is a union labor organization, doing business within and representing its members within the District.

9.　　At all times relevant, Plaintiff was a member in good standing of UFCW 881.

2

10.     Plaintiff began employment with Jewel on November 2, 1986. Her performance reviews have always been very good and she had previously believed that she was a valued employee of Jewel.

11.     On or about January 19, 2012, Plaintiff was employed as a receiving clerk by Jewel at its store located at 3940 E. 106th Street, Chicago, Illinois (Store #3139).

12.     On or about January 19, 2012, shortly prior to the end or her work shift at the aforesaid store, Plaintiff received an urgent call from her daughter that Plaintiff's four-year-old grandson was having difficulty breathing and requested Plaintiff to take him immediately to the doctor.

13.     At the time she received the urgent call from her daughter, Plaintiff was processing damaged goods and misplaced product, including bags of birdseed.

14.     Just prior to receiving the call, Plaintiff had placed a 25-pound bag of overstock birdseed into a shopping cart in order to take it to the self-checkout stand located near the front of the store so other employees would subsequently return the birdseed to the shelves.

15.     Jewel was aware that in performing her job duties, Plaintiff would often be required to take product that was to be re-shelved to the self-checkout stand, which is past the point of sale yet still inside the store.

16.     In a rush due to the medical emergency of her grandson, Plaintiff gathered her personal items and her unfinished lunch and placed them in the child-seat portion of the cart. The bag of birdseed was in the basket of the cart, which was open and visible to anyone.

17.     As was Plaintiff's normal custom and practice, she stopped at the security guard who

3

was standing at the door inside the store and showed him the receipt for her lunch. When the security guard asked Plaintiff about a receipt for the birdseed, Plaintiff realized that she had not left the cart in the front of the self-checkout stand but then did so immediately. The self-checkout stand is **inside** the store and is approximately three feet or less from where she stood with the security guard.

18. A photograph taken of the area where Plaintiff stopped by the security guard is attached hereto and incorporated herein as Exhibit B. The Jewel employee in the photograph is standing at the same self-checkout stand where Plaintiff would often place product to be re-shelved and also where she placed the shopping cart with the birdseed.

19. Plaintiff then immediately left the Jewel Store, and took her grandson to the doctor's office. Due to the medical emergency, Plaintiff was also unable to work at her regularly-scheduled shift as a crossing guard for the Thornton Police Department. A copy of the note from the Thornton Police Department and a note from her grandson's doctor are attached hereto and incorporated herein as Exhibits C and D, respectively.

20. Plaintiff continued to work at her job the following day, which was a Friday, on Saturday, and on Monday as well.

21. On January 23, 2012, during Plaintiff's normal work shift, she was requested to come to the manager's office. In the office was the head of security for the store who asked her to write out a statement as to what happened on January 19, 2012. Plaintiff believed the January 19, 2012 incident to be a non-issue. Shortly thereafter, the head of security advised Plaintiff that she was suspended until further notice or

4

until they completed their investigation. Plaintiff was told by the Jewel Manager that there was a videotape of Plaintiff in the store. When Plaintiff requested to see the videotape, she was refused. However, Plaintiff was told her union representative could obtain the videotape.

22.    On January 23, 2012, after the meeting in the manager's office Plaintiff called her union representative at UFCW 881, Marcella Robinson. Plaintiff told Ms. Robinson what happened at the meeting in the manager's office and that Plaintiff had been suspended. Ms. Robinson said she would file a grievance regarding the suspension and to contact her if Jewel asked Plaintiff to come back to the store.

23.    The UFCW 881 filed a grievance on January 25, 2012. A copy of the Grievance Investigation Report is attached hereto and incorporated herein as Exhibit E.

24.    On January 28, 2012, Plaintiff was contacted by one of the store co-managers, who requested that Plaintiff come to the store. Plaintiff contacted Ms. Robinson and a meeting was scheduled for January 31, 2012.

25.    On January 31, 2012, Plaintiff and Ms. Robinson came to the store manager's office. In the office was the acting store manager. Plaintiff was given a document entitled "Associate Corrective Action Review" and told to sign the document. A copy of the "Associate Corrective Action Review" is attached hereto and incorporated herein as Exhibit F.

26.    The "Associate Corrective Action Review" contains false statements of fact. Plaintiff did not misappropriate company property. Plaintiff did not walk out of the store with a 25-pound bag of birdseed alone in a shopping cart without paying for it.

27.    The "Associate Corrective Action Review" also omits relevant information. Under

5

"Special Circumstances," nothing is stated regarding the urgent medical attention required by her grandson. Plaintiff left the birdseed at the self-checkout stand where she has customarily left other product to be re-shelved.

28. Because the "Associate Corrective Action Review" contains false statements of fact and omissions of relevant information, Plaintiff refused to sign the document.

29. At the January 31, 2012 meeting, Plaintiff was then terminated immediately. Plaintiff's termination was based upon the "Associate Corrective Action Review."

30. On January 31, 2012, after being terminated, Plaintiff requested that her union representative at UFCW 881, Ms. Robinson, file a grievance regarding her termination. Ms. Robinson told Plaintiff that she would consult with her supervisor and get back to Plaintiff if something more could be done.

31. In or about mid-February 2012, Plaintiff received a call from her union representative at UFCW 881, Ms. Robinson. Ms. Robinson advised Plaintiff that the grievance had been denied and that UFCW 881 was not going to do anything further.

32. On or about February 21, 2012, Plaintiff received a letter from her UFCW 881 stating that UFCW 881 was not going to pursue her grievance through arbitration. A copy of the February 21, 2012 letter is attached hereto and incorporated herein as Exhibit G.

33. On or about March 6, 2012, Plaintiff, through her attorney, Leslie A. Morse, sent a written request for appeal and reconsideration of UFCW 881's decision not to proceed with arbitration. A copy of the appeal letter is attached hereto and incorporated herein as Exhibit H.

34. On or about April 11, 2012, Plaintiff received a letter from UFCW 881 stating that

that the Executive Board denied Plaintiff's appeal because her "grievance lacked merit in arbitration." UFCW 881 then closed the matter. A copy of the April 11, 2012 letter is attached hereto and incorporated herein as Exhibit I.

35. In or about August of 2012, Plaintiff learned that her union representative at UFCW 881, Ms. Robinson, viewed a videotape that definitively shows that Plaintiff did not leave the store with a 25-pound bag of birdseed.

## Count I: Breach of UFCW 881's Duty of Fair Representation

36. Plaintiff adopts and re-alleges paragraphs 1-35 of this Complaint into this Count I.

37. At all times relevant, UFCW 881 had a duty to fairly represent each of its members, including Plaintiff.

38. UFCW 881 breached its duty to fairly represent Plaintiff by the following acts and omissions:

a. Failed to serve upon Jewel a written demand for arbitration where it was aware that Plaintiff's termination was based upon false facts and omission of relevant important information;

b. Failed to serve upon the Defendants Employer a written demand for arbitration where there was no just cause to suspend or terminate Plaintiff.

c. Failed to serve upon Jewel a written demand for arbitration where the Jewel breached the Collective Bargaining Agreement by suspending and terminating Plaintiff from her employment;

d. Failed to use videotape evidence that would conclusively show that Plaintiff did not leave the store with birdseed, as falsely stated in the

7

"Associate Corrective Action Review";

e.      Allowed Plaintiff to be terminated based on facts that UFCW 881 was aware were false;

f.      Allowed Plaintiff to be falsely accused of misconduct when UFCW 881 was aware of facts and information to the contrary;

g.      Failed to adequately conduct an investigation, as required, that would have demonstrated that the facts that premised the termination of Plaintiff were false;

h.      Irrationally, arbitrarily, and incompetently failed to address the false facts and missing relevant information on the "Associate Corrective Action Review," which was the alleged basis for the suspension and termination of Plaintiff's employment by Jewel; and

i.      Failed to adequately and competently represent Plaintiff throughout the grievance procedure as provided in the Local 881 UFCW Contract 2010 2013, Jewel Food Stores, Inc. Chicagoland.

39.    The representation of Plaintiff by the UFCW 881 was inadequate, negligent, arbitrary, and irrational and has caused severe harm to the career and well-being of the Plaintiff.

40.    By its refusal to take any further action regarding Plaintiff suspension and termination of employment, including but not limited to a written demand for arbitration, UFCW 881 improperly, arbitrarily, and irrationally precluded Plaintiff from asserting her rights under the contract and common law to redress the breach of contract and wrongful termination by Jewel.

8

Wherefore, Plaintiff requests that this Court:

A.     Find that UFCW 881 has violated applicable law, reinstate Plaintiff in her position with Jewel, award Plaintiff compensatory damages to compensate her for her damages, including but not limited to, back wages, front wages, employee benefits, and other emoluments of employment, with interest as permitted;

B.     Award attorneys' fees and costs arising out of this action; and

C.     Grant any other relief this court deems equitable and just.

### Count II: Breach of Contract and Wrongful Termination

41.     Plaintiff adopts and re-alleges paragraphs 1-35 of this Complaint into this Count II.

42.     Jewel breached their contract with UFCW 881 and Plaintiff by the following acts and omissions:

      a.     Suspended and terminated the employment of Plaintiff without just cause;

      b.     Suspended and terminated the employment of Plaintiff based on false facts and missing relevant information;

      c.     Failed to adequately investigate the facts and circumstances prior to suspending and terminating the employment of Plaintiff;

      d.     Failed to follow the grievance procedures and provided in the Local 881 UFCW Contract 2010-2013, Jewel Food Stores, Inc. Chicagoland;

      e.     Wrongfully suspended and terminated the employment of Plaintiff;

      f.     Failed to allow Plaintiff to adequately address the false facts and allegations contained in "Associate Corrective Action Review," which was the alleged basis for the suspension and termination of Plaintiff's

9

employment; and

g.      Suspended and terminated the employment of Plaintiff based upon false facts and missing relevant information in the document "Associate Corrective Action Review."

Wherefore, Plaintiff requests that this Court:

A.      Find that Jewel has violated applicable law and award to Plaintiff compensatory damages to compensate her for damages, including but not limited to, back wages, front wages, employee benefits, and other emoluments of employment;

B.      Award attorneys' fees and costs arising out of this action; and

C.      Grant any other relief this court deems equitable and just.

### Count III: Defamation Per Se against Jewel

43.     Plaintiff adopts and re-alleges paragraphs 1-35 of this Complaint into this Count III.

44.     In paragraph 17 of Jewel's Answer to Plaintiff's Complaint, Jewel admits that Plaintiff did not leave the store with a 25 lb. bag of birdseed. Defendant Jewel's Answer and Affirmative Defenses to Plaintiff's Complaint is incorporated and attached hereto as Exhibit J.

45.     In Jewel's answer to Plaintiff's fifth written interrogatory, Jewel admits that Plaintiff did not walk out of the store. Defendant Jewels' Answers to Plaintiff's First Set of Interrogatories is incorporated and attached hereto as Exhibit K.

46.     Jewel, by and through its agents and/or employees, committed defamation per se by the following acts and omissions:

a.  On January 31, 2012, the Defendant Jewel made the following false statement in

10

Plaintiff's Associate Corrective Action Review: "Patricia walked out of the store with a 25 lb. bag of bird seed alone in a shopping cart without paying for it."

b. On January 31, 2012, the Defendant Jewel made the following false statement in Plaintiff's Associate Corrective Action Review: Patricia was terminated due to "Misappropriation of Company Property".

c. Defendant Jewel made the false statements in a HR document, the Associate Corrective Action Review, available to other Jewel employees and in the presence of a witness who signed the document.

d. Defendant Jewel knew, or recklessly disregarded the truth, that Plaintiff **did not** "walk out of the store with a 25 lb. bag of bird seed alone in a shopping cart." Patricia did not walk out of the store with the bird seed and the bird seed was not alone in a shopping cart.

e. Defendant Jewel knew, or recklessly disregarded the truth, the Plaintiff **did not** misappropriate company property.

f. Defendant Jewel intentionally failed to investigate the truth of its statements.

g. Defendant Jewel also intentionally failed to include "Special Circumstances (i.e. Mitigating Circumstances)", particularly that Plaintiff was rushing out of the store because she had just received a phone call that her grandson was having difficulty breathing and needed to see a doctor.

h. The Defendant Jewel's statements impute Plaintiff with the commission of a crime.

i. The Defendant Jewel's statement prejudices Plaintiff and imputes Plaintiff with lack of ability in her trade.

11

    j.   As a result of Defendant Jewel's false and defamatory statements, the Plaintiff was injured in her reputation.

Wherefore, Plaintiff requests that this Court:

    A.   Find that Jewel has violated applicable law and award to Plaintiff compensatory damages to compensate her for damages, including but not limited to, back wages, front wages, employee benefits, and other emoluments of employment, anxiety, stress, humiliation, diminution of reputation;

    B.   Find that Jewel has violated applicable law and award to Plaintiff punitive damages;

    C.   Award attorneys' fees and costs arising out of this action; and

    D.   Grant any other relief this court deems equitable and just.

### Count IV: Defamation Per Quod against Jewel

47.   Plaintiff adopts and re-alleges paragraphs 1-35 of this Complaint into this Count IV.

48.   In paragraph 17 of Jewel's Answer to Plaintiff's Complaint, Jewel admits that Plaintiff did not leave the store with a 25 lb. bag of birdseed. Defendant Jewel's Answer and Affirmative Defenses to Plaintiff's Complaint is incorporated and attached hereto as Exhibit J.

49.   In Jewel's answer to Plaintiff's fifth written interrogatory, Jewel admits that Plaintiff did not walk out of the store. Defendant Jewels' Answers to Plaintiff's First Set of Interrogatories is incorporated and attached hereto as Exhibit K.

50.   Jewel, by and through its agents and/or employees committed defamation per quod by the following acts and omissions:

    a.  On January 31, 2012, the Defendant Jewel made the following false statement in

Plaintiff's Associate Corrective Action Review: "Patricia walked out of the store with a 25 lb. bag of bird seed alone in a shopping cart without paying for it."

b. On January 31, 2012, the Defendant Jewel made the following false statement in Plaintiff's Associate Corrective Action Review: Patricia was terminated due to "Misappropriation of Company Property".

c. Defendant Jewel made the false statements in a HR document the Associate Corrective Action Review, available to other Jewel employees and in the presence of a witness who signed the document.

d. Defendant Jewel knew, or recklessly disregarded the truth, that Plaintiff **did not** "walk out of the store with a 25 lb. bag of bird seed alone in a shopping cart." Patricia did not walk out of the store with the bird seed and the bird seed was not alone in a shopping cart.

e. Defendant Jewel knew, or recklessly disregarded the truth, the Plaintiff **did not** misappropriate company property.

f. Defendant Jewel intentionally failed to investigate the truth of its statements.

g. Defendant Jewel also intentionally failed to include "Special Circumstances (i.e. Mitigating Circumstances)", particularly that Plaintiff was rushing out of the store because she had just received a phone call that her grandson was having difficulty breathing and needed to see a doctor.

h. The Defendant Jewel intended its statements to mean, and is understood by any reasonable listener or reader to mean, that Plaintiff stole a 25 lb. bag of bird seed thus imputing Plaintiff with the commission of a crime.

i. The Defendant Jewel's statement prejudices Plaintiff and imputes Plaintiff with

13

lack of ability in her trade.

j.   As a result of Defendant Jewel's false and defamatory statements, the Plaintiff was injured in her reputation, lost her job, lost insurance, lost benefits, and has been unable to receive employment since termination. Plaintiff has also suffered anxiety, stress and embarrassment.

Wherefore, Plaintiff requests that this Court:

A.   Find that Jewel has violated applicable law and award to Plaintiff compensatory damages to compensate her for damages, including but not limited to, back wages, front wages, employee benefits, and other emoluments of employment, anxiety, stress, humiliation, diminution of reputation;

B.   Find that Jewel has violated applicable law and award to Plaintiff punitive damages;

C.   Award attorneys' fees and costs arising out of this action; and

D.   Grant any other relief this court deems equitable and just.

[signature page to follow]

14

Plaintiff, Patricia Rupcich,


By: __s/ Neal C. Zazove_____
                    One of Her Attorneys

Neal C. Zazove
Johanna R. Stein
Neal C. Zazove & Associates, P.C.
19 South LaSalle Street, Suite 1200
Chicago, Illinois 60603
(312) 641 - 5444
topspyn@ameritech.net
jsteinzazlaw@att.net

15

# LOCAL 881 UFCW CONTRACT 2010-2013

# JEWEL FOOD STORES, INC. CHICAGOLAND

RONALD E. POWELL
PRESIDENT, LOCAL 881 AND
UFCW INTERNATIONAL VICE PRESIDENT

STEVEN M. POWELL
SECRETARY-TREASURER, LOCAL 881 AND
UFCW INTERNATIONAL VICE PRESIDENT



**a VOICE for Working Families**

UNITED FOOD and COMMERCIAL WORKERS INTERNATIONAL UNION
10400 West Higgins Road, Suite 500, Rosemont, IL 60018 • (847) 294-5064

EXHIBIT

**A**

Dear Local 881 Jewel Food Stores Member:

The following pages of this booklet contain the text of your 2010-2013 Union Contract between your Union, Local 881 UFCW, and your Employer.

Your contract was voted on and approved overwhelmingly by you the membership; you should be proud of your contract. We recommend that you familiarize yourself thoroughly with the entire agreement, in particular any provisions that pertain to your wages, overtime and premiums, health care coverage and rules governing your working conditions.

In the event that you have a situation arise or would like to file a grievance as a result of a violation over any part of this contract, it is important that you contact your Union immediately. You may contact your Union Representative at 847-294-5064.

In Solidarity,

Ronald E. Powell
President, Local 881 and
UFCW International Vice President

Steven M. Powell
Secretary-Treasurer, Local 881
UFCW International Vice President





**Union Rights** — I refuse to submit to this interrogation because I fear that I will suffer severe discipline or termination of my employment and I demand my right to have Union Representation present on my behalf before this proceeding continues and if my demand is not acknowledged, then I refuse to participate in this process. **Exercise Your Rights. Call The Union!**

CONTRACT BETWEEN

UNITED FOOD AND COMMERCIAL WORKERS
INTERNATIONAL UNION, LOCAL 881

and

JEWEL FOOD STORES, INC.
TERM: 1/24/2010 through 1/26/2013

ARTICLES OF AGREEMENT...............................................................................................1

ARTICLE 1          RECOGNITION OF THE UNION

    Section 1.1       Recognition..........................................................................1

ARTICLE 2          GENERAL

    Section 2.1       Requirements for Certain Positions..................................1
    Section 2.2       Notices......................................................................1
    Section 2.3       Partial Invalidity ....................................................2
    Section 2.4       Marginal Headings................................................2
    Section 2.5       Effective Date .......................................................2
    Section 2.6       Amendments.........................................................2
    Section 2.7       Americans With Disabilities Act (ADA)............................2

ARTICLE 3          WORKING HOURS AND OTHER CONDITIONS OF EMPLOYMENT

    Section 3.1       Workday and Workweek.......................................2
    Section 3.2       Work Schedules...................................................3
    Section 3.3       Meal and Rest Periods.........................................3
    Section 3.4       Overtime and Other Premium Pay .....................3
    Section 3.5       Pyramiding of Overtime and Premium Pay Prohibited.....................4
    Section 3.6       Call-In Pay ...........................................................4
    Section 3.7       Full-Time Employment Required When Practicable...........................4
    Section 3.8       Out of Classification Work ...................................4
    Section 3.9       Scheduling of Part-Time Employees .................4
    Section 3.10      Dress and Appearance Code.............................5
    Section 3.11      Office Work ..........................................................5

ARTICLE 4          WAGES

    Section 4.1       Wage Rates..........................................................5
    Section 4.2       Manager Relief.....................................................5
    Section 4.3       Receiving Clerk.....................................................5
    Section 4.4       Scan Coordinators and Personnel Coordinators ...............................5
    Section 4.5       Relief of Department Heads ................................5
    Section 4.6       Recording of Time Worked .................................5

Section 4.7     Employer Meetings - Required Attendance....................................5
Section 4.8     Previous Comparable Experience............................................5

ARTICLE 5       VACATIONS, HOLIDAYS & ABSENCE LEAVES
Section 5.1     Length of Vacation.............................................................6
Section 5.2     Vacation Qualifications ....................................................6
Section 5.3     Vacation Pay ....................................................................6
Section 5.4     Vacation Administration ...................................................6
Section 5.5     Adjustment of Vacation Pay in Event of Layoff or
                Separation from Service.................................................6
Section 5.6     Holidays Recognized .........................................................7
Section 5.7     Leave of Absence..............................................................8
Section 5.8     Military and Pregnancy Leaves ........................................8
Section 5.9     Union Leave of Absence....................................................8
Section 5.10    Jury Pay ............................................................................8
Section 5.11    Funeral Leave ...................................................................9
Section 5.12    Compensable Injuries on the Job .....................................9

ARTICLE 6       OTHER BENEFITS
Section 6.1     Retirement Benefits ..........................................................9
Section 6.2     Health Care Plan ..............................................................9
Section 6.2(B)  Qualification for Coverage..............................................10
Section 6.3     Maintenance of Coverage...............................................12
Section 6.4     Employee Stock Plan.......................................................12
Section 6.5     Replacement Plans .........................................................12

ARTICLE 7       SENIORITY
Section 7.1     Seniority and Other Definitions.......................................12
Section 7.2     Seniority Area - Full-Time Employees.............................12
Section 7.3     Layoffs and Recalls after Layoffs - Full-Time Employees...............12
Section 7.4     Layoffs and Recalls after Layoffs - Part-Time Employees ..............13
Section 7.5     Selection of Employees for Full-Time Employment .........13
Section 7.6     Promotion of Service Clerks............................................13
Section 7.7     Promotion to Supervision ...............................................13
Section 7.8     Seniority of Employees on Leaves of Absence................13
Section 7.9     Seniority Preference........................................................13

ARTICLE 8       UNION-MANAGEMENT RELATIONS
Section 8.1     Union Shop.....................................................................13
Section 8.2     Union Dues Checkoff ......................................................14
Section 8.3     Active Ballot Club Checkoff ............................................14
Section 8.4     Indemnification ..............................................................14
Section 8.5     Union..............................................................................14

| | | |
|---|---|---|
| Section 8.7 | Union Officers and Stewards | 14 |
| Section 8.8 | Stewards Conference | 14 |
| Section 8.9 | Display of Contract and Union Shop Cards | 14 |
| Section 8.10 | Employee Lists | 14 |
| Section 8.11 | Management Rights | 14 |
| Section 8.12 | Discipline | 14 |
| Section 8.13 | Picket Lines | 15 |
| Section 8.14 | Clerks Work Jurisdiction | 15 |
| Section 8.15 | Discrimination | 15 |
| Section 8.16 | Automation | 15 |
| Section 8.17 | Service Clerk Duties | 15 |
| Section 8.18 | Violation of Service Clerk Duties | 15 |
| Section 8.19 | Social Security Administration Regulations And Inquiries | 16 |

**ARTICLE 9**     NO STRIKES; NO LOCKOUTS; GRIEVANCES & ARBITRATION

| | | |
|---|---|---|
| Section 9.1 | No Strikes; No Lockouts | 16 |
| Section 9.2 | Grievances | 16 |
| Section 9.3 | Arbitration | 16 |

**ARTICLE 10**     MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| Section 10.1 | New Store/Re-Grand Opening Hiring Procedures | 17 |
| Section 10.2 | Travel Hardships | 17 |
| Section 10.3 | New Methods - New Job Classifications | 17 |
| Section 10.4 | Quarterly Meetings | 17 |
| Section 10.5 | Emergency Call in Policy | 17 |
| Section 10.6 | Transfers | 18 |

**ARTICLE 11**     STORE CLOSING

| | |
|---|---|
| Section 11.1 through Section 11.12 Store Closing | 18 |

**ARTICLE 12**     TERM

| | | |
|---|---|---|
| Section 12.1 | Initial Term | 18 |
| Section 12.2 | Renewal Term | 18 |

| | |
|---|---|
| Memorandum of Supplemental Agreements | 18 |
| Bakery and General Merchandise Supplement | 19 |
| Flower Shop Supplement | 19 |
| Bulk Foods and Salad Bar Supplement | 20 |
| Letters of Understanding | 20 |
| WAGES Appendix A | 22 |

# CONTRACT BETWEEN

## UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 881
### AND
### JEWEL FOOD STORES , INC.

### TERM: 1/24/2010 through 1/26/2013

## ARTICLES OF AGREEMENT

THIS AGREEMENT entered into this 15th day of November, 2011, by and between JEWEL FOOD STORES, INC., a corporation, hereinafter called the "Employer", and the UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 881, a voluntary association, hereinafter referred to as the "Union".

## ARTICLE 1
## RECOGNITION OF THE UNION

### Section 1.1 Recognition

The Employer recognizes the Union as the sole collective bargaining agency for all its employees employed in the retail food stores, family centers, or specialty stores operated by the Jewel Food Stores Division in and around northern Illinois and Indiana in the following counties:

In Indiana: Lake and Porter Counties;

In Illinois: Cook, DuPage, Will, DeKalb, McHenry and Lake Counties; those parts of Kane County lying east of Highway 47; and the City of Kankakee in Kankakee County.

Excluding, however, all store managers and other employees defined as supervisors by the National Labor Relations Act, security officers, meat department employees, independent contractors and craftsmen such as carpenters, millworkers, steamfitters, etc., performing work in the stores but paid from other than store payrolls.

## ARTICLE 2
## GENERAL

### Section 2.1 Requirements for Certain Positions

Each store in the collective bargaining unit shall have:
(A) Service Manager, who shall be responsible for the efficient operation of the following departments and operations:

    (1) The check-out department, including the training of checkers and parcelers, and the assignment and supervision of check-out personnel;

    (2) The receipt, handling and remittance of cash;

    (3) Such other bookkeeping as may be required including making the necessary reports to the office; and

    (4) Such other work as may be assigned to the Service Manager by the Employer.

(B) Assistant Service Manager, whose principal duty shall be assisting the Service Manager with bookkeeping and reporting duties, but who shall also assist in supervising all checking department operations, particularly when the Service Manager is absent or off duty.

(C) An Assistant Manager, such Assistant Manager to have as his/her duties assisting the Store Manager in supervising the operation of the store, including being in charge of the store whenever the Manager is off, and particularly when the store is open for business at night.

(D) A Farmstand Manager (Produce Manager), who shall be responsible for the preparation, display and sale of all fresh fruits and vegetables and such other duties as the Store Manager may assign to him/her.

(E) Dairy/Frozen Food Manager, in each store where the gross sales volume exceeds two hundred and fifty thousand dollars ($250,000) per week. The sales volume will be determined as of 2nd and 8th periods of the Company's audited sales reports. These individuals will be identified at the start of the 4th and 10th periods each year. The duties of the Dairy/Frozen Food Manager shall include but not be limited to: ordering, receiving, preparing, displaying, maintaining and selling all frozen/dairy food products. The Dairy/Frozen Food Manager shall also be responsible for the scheduling and work assignments of the people in those departments and such other duties as may be assigned to him/her. The Company has the exclusive right to select said manager.

An employee who has been designated as Dairy/Frozen Food Manager shall receive forty cents ($0.40) per hour in addition to their applicable hourly rate of pay.

(F) Store Supervisors, it was agreed that in stores where the average weekly sales volume exceeds $165,000 per week, the Employer may appoint non-bargaining unit supervisory managers for front-end operations and perishable operations. In the event the Employer so elects to appoint such supervision, it is agreed that in the front end operations, two (2) assistant front-end managers would be designated.

In the perishable area it was agreed that one (1) head clerk, namely either head produce clerk or head perishable clerk, would be appointed and paid a premium of twenty-five cents (25¢) per hour over their applicable rate. The duties of the head perishable clerk could encompass all perishable operations, including produce, dependent on the needs of the particular store involved. As of 4/22/96, stores that currently are paying two (2) head clerks will, through attrition, reduce to one (1) head clerk.

The utilization of non union supervisors already permitted will not reduce the hours of full-time employees.

The Employer shall have thirty (30) days from the date such requirements become effective in which to fill any positions required above, except that when a permanent vacancy in any required classification occurs because of transfer, promotion, separation from service, etc., such vacancy shall be filled within thirty (30) days. The requirements for a new or remodeled store shall be determined on the basis of the average weekly total sales for the last three (3) accounting periods of the first four (4) accounting periods of operation following the date of opening or remodeling.

### Section 2.2 Notices

All notices required under this Agreement shall be deemed to be properly served if delivered in writing personally or sent by certified or registered mail to the general offices of the Union at 10400 W. Higgins

1

Road, Suite 500, Rosemont, Illinois 60018-3705, or to the Employer at 150 Pierce Road, Suite 200, Itasca, Illinois 60143, or to an employee at his/her home or residence address, or to any subsequent address which the Union, the Employer, or the employee may designate in writing for such purpose. Date of service of a notice served by mail shall be the date on which such notice is postmarked by a post office of the United States Post Office Department.

### Section 2.3 Partial Invalidity

Nothing contained in this Agreement is intended to violate any State or Federal Law, Rule or Regulation made pursuant thereto. If any part of this Agreement is construed by a Court or Board of competent jurisdiction to be in such violation, then that part shall be null and void, but the remainder of this Agreement shall continue in full force. The parties will immediately begin negotiations to replace the void part with a valid provision.

### Section 2.4 Marginal Headings

The captions of the several Articles and Sections of this Agreement are for convenience only and in no way limit, enlarge, define, or otherwise affect the scope or intent of any provision thereof.

### Section 2.5 Effective Date

Unless the context indicates otherwise, all provisions of this Agreement become effective on the date of execution hereof.

### Section 2.6 Amendments

This Agreement is subject to amendment, alteration or addition only by a subsequent written agreement between, and executed by, the Employer and the Union. The waiver of any breach, term or condition of this Agreement by either party shall not constitute a precedent in the future enforcement of all its terms and conditions.

### Section 2.7 Americans With Disabilities Act (ADA)

In the event the Employer intends to alter any terms or conditions of employment covered by the Collective Bargaining Agreement in order to meet its obligations under the Americans With Disabilities Act or the regulations promulgated there under, the Employer will notify the Union in advance of any such alterations, and agrees to discuss same with the Union prior to implementation if so requested.

If the Union cannot agree to the proposed alterations, the Union does not waive its rights to grieve the reasonableness of the Company's actions under the Agreement, or its rights, if any, under the National Labor Relations Act.

## ARTICLE 3
## WORKING HOURS AND OTHER
## CONDITIONS OF EMPLOYMENT

### Section 3.1 Workday and Workweek

(A) (1) The standard workweek for full-time employees hired on or before 3/29/93 shall be forty (40) hours to be worked in five (5) shifts of not less than eight (8) hours each Monday through Saturday, but not necessarily consecutive. The standard workday or shift for full-time employees may be scheduled at any time between the hours of 5:30 a.m. and thirty (30) minutes after store closing.

(2) The standard workweek for full-time employees promoted or hired after 3/29/93 shall be forty (40) hours to be worked in five (5) shifts of not less than eight (8) hours each Sun-

day through Saturday, but not necessarily consecutive. The standard workday or shift for full-time employees may be scheduled at any time between the hours of 5:30 a.m. and thirty (30) minutes after store closing.

(B) (1) Full-time employees hired on or before 3/29/93 may voluntarily work a thirty-five (35) hour workweek within five (5) days. Full-time employees exercising this option shall retain full-time status. By mutual agreement, full-time employees may work four (4) days or nights per week Monday through Saturday either eight (8) hours, eight and one-half (8-1/2) hours, nine (9) hours, or ten (10) hours per shift as mutually agreed, in which case overtime shall be paid after forty (40) hours work per week. Agreements for workweeks other than the standard workweek in paragraph (A)(1) above must be supported in writing pursuant to Section 3.2(A) below.

(2) Full-time employees promoted or hired after 3/29/93 may voluntarily work a thirty-five (35) hour workweek within five (5) days. Full-time employees exercising this option shall retain full-time status. By mutual agreement, full-time employees may work four (4) days or nights per week Sunday through Saturday either eight (8) hours, eight and one-half (8-1/2) hours, nine (9) hours, or ten (10) hours per shift as mutually agreed, in which case overtime shall be paid after forty (40) hours work per week. Agreements for workweeks other than the standard workweek in paragraph (A) (2) above must be supported in writing pursuant to Section 3.2(A) below.

(C) During holiday weeks the workweek for full-time employees shall be thirty-two (32) hours to be worked in four (4) days of not less than eight (8) hours each. Full-time employees working forty (40) or less hours per week in accord with paragraph (B) above shall be scheduled to work a prorated holiday workweek in either three or four days as applicable.

(D) Full-time employees specifically assigned or hired to perform the functions of night stocking and store maintenance and who work the majority of their straight-time hours between 9:00 p.m. and 8:00 a.m. shall be classified as night crew employees and paid the rate classification as their regular rate of pay including vacation and holiday pay. Night shift employees shall not be required to work without ten (10) hours rest between shifts. The Employer has the right to designate the night on which holidays are to be observed, it being understood that the Employer will post a two (2) week prior notice as to the night of observation. The designated night must be the night before or the night of the nationally observed holiday. Full-time night crew employees cannot be scheduled to work both the night of the designated holiday and the night of the nationally observed holiday. The rate of pay for shift starts on the night of the designated holiday shall be at a rate of time and one-half (1-1/2) the regular straight-time hourly rate for all hours worked on that shift even though completion of that shift may occur on the following day. Conversely, the rate of pay for shift starts on the night prior to the designated holiday shall be at straight time for all hours worked on that shift even though completion of that shift may occur on the designated holiday. Shift starts during the holiday week shall not be altered to avoid the time and one-half (1-1/2) pay. Night crews consisting of four or more regularly assigned persons shall have a designated night crew chief who shall be paid in accordance with the wage schedule. A night crew chief need not be designated if the night crew is assigned to an Assistant Manager to oversee the night crew function, in which event the Assistant

Case: 1:10-cv-06653-CHB Doc #: 24 Filed: 01/15/13 Page 22 of 77 PageID #: 229

2

Manager shall be paid at the contract rate for the Assistant Manager classification. Night crews may be scheduled up to five (5) full shifts commencing 10:00 p.m. Sunday night through 9:59 p.m. Saturday night as their basic workweek. Hours worked outside the basic workweek shall be paid at time and one-half (1-1/2) the employees' regular straight-time hourly rate.

Full-time Night Crew employees hired on or before 3/29/93 may volunteer to have their Sunday included in the basic workweek. The workweek for full-time Night Crew employees promoted or hired after 3/29/93 is set forth in Section 3.1(A)(2).

(E) Part-time employees specifically assigned or hired as night crew employees shall be paid at a rate of time and one-half (1-1/2) the regular straight-time hourly rate for all hours worked on the nationally observed holiday. However, part-time night crew employees can be scheduled on both the designated holiday and the nationally observed holiday.

## Section 3.2 Work Schedules

(A) No Split Shift - Variations

The Employer shall not schedule a "split" shift, i.e., any workday the continuity of which is broken by a period longer than a meal period, or a "spread" workweek, i.e., a standard workweek a ver six (6) days. Variations from the standard workday and workweek may be worked with the prior written consent of the individual employee and the Union, provided that no less than the minimum rates of pay provided herein are paid, and the agreement is in writing signed by employee, the Union and the Employer. Such agreements may be revoked at any time by any party thereto by giving seven (7) calendar days written notice to the other parties. No employee shall be scheduled without at least eight (8) hours rest between shifts, unless otherwise mutually agreed to by the Employer and the employee or in cases of emergency.

(B) Posted Work Schedules

The Employer shall post in ink or other permanent means, in each store the current work schedule for all employees working in the store. The schedule shall be posted by no later than Friday, 12:00 p.m. of the week preceding the following Monday through Sunday work days. The schedule shall list the names of the employees in accordance with seniority and classification. Work schedules shall be maintained in the store for a three (3) month period of time and shall be made available to an authorized representative of the Union. Schedules must be accessible to employees. No employee who is called into work out of the posted schedule shall be required to take compensatory time off from the posted work schedule. Posted schedules may be changed when operating conditions or emergencies make changes necessary, provided that indiscriminate changes shall not be made and the employees affected shall be given reasonable notice. There shall be a company-wide form/bonk procedure for requesting time off.

(C) Night and Sunday Rotation

The Employer agrees to rotate night and Sunday work among its regular full-time employees, other than those specifically hired for such night or Sunday work, in each store open at night or on Sunday.

(B) Christmas Eve and New Year's Eve

No employee will be required to work after 6:00 p.m. on Christmas Eve and 9:00 p.m. on New Year's Eve. However, employees will be required to work until all customers leave the store and closing procedures are completed.

## Section 3.3 Meal and Rest Periods

(A) Rest Periods

Each employee shall be given one uninterrupted ten (10) minute rest period after three (3) hours of work, and a second rest period after seven (7) hours work with a maximum of two (2) rest periods per workday or shift. Breaks shall be taken as near as practicable in the middle of each half day. This provision is to be administered as as to assure each employee ten (10) minutes in the lunch room provided by the Employer.

(B) Meal Periods

No employee shall be required to work more than five (5) continuous hours without an unpaid lunch or dinner period, which shall be not less than one-half (1/2) hour nor more than one (1) hour, uninterrupted, as agreed with the employee. Lunch, dinner and rest periods shall be taken as scheduled by the Store Director who shall schedule the meal period as near as practicable to the middle of the workday. The employee may request a meal period be waived pursuant to the Employer's written waiver form.

## Section 3.4 Overtime and Other Premium Pay

All employees may be required and scheduled to work overtime. Overtime and other premium pay shall be paid as follows:

(A) Time and one-half (1-1/2) the employee's regular hourly rate of pay shall be paid for all work:

(1) After eight (8) hours on a work shift except where the workday is extended beyond eight (8) hours pursuant to Section 3.1(B)(1) and (2) by written variation;

(2) After forty (40) hours in a regular workweek, i.e., a workweek other than a workweek containing a holiday recognized under this Agreement;

(3) After thirty-two (32) hours in any week containing a holiday;

(4) On Sundays, for employees, excluding service clerks, hired before November 1, 1998. Employees hired on or after November 1, 1998 shall be paid the following Sunday premiums; 0-6 months, one dollar and twenty-five cents ($1.25) per hour plus the regular hourly rate, beginning the seventh (7th) month, and thereafter time and one half (1-1/2) will be paid. The one dollar and twenty-five cent ($1.25) per hour premium will not apply to service clerks who are receiving time and one half (1-1/2) at the time of promotion. They will receive time and one half (1-1/2) while in the 0-6 month bracket.

Employees hired after August 11, 2005, shall receive premiums for work on Sundays as follows:

0-12 months = $1.00 per hour;
13-24 months = $2.00 per hour;
25 months and over = $2.50 per hour;

3

(5) On holidays plus any holiday pay due under Section 3.6 Employees hired after August 11, 2006, shall receive premiums for work on holidays as follows.

0 - 12 months = $1.25 per hour;
13 - 24 months = $2.00 per hour;
25 months and over = Time and ½ per hour;

(6) Performed by full-time employees after 7:00 p.m. on Saturdays, excluding employees specifically designated as night crew employees. This premium will be applicable only to employees who were hired or promoted to full-time status prior to March 14, 1976;

(7) Night crews will be paid time and one-half (1-1/2) their regular straight-time rate of pay for all work performed in excess of eight (8) consecutive hours except where their standard workweek or workday has been modified in accordance with Section 3.1(B)(1) and (2) in which event time and one-half (1-1/2) the straight-time rate of pay will be paid for hours worked in excess of any regular standard shift.

(B) All employees, excluding night crew employees, shall receive fifty cents ($0.50) per hour in addition to the regular straight-time hourly rate for work performed between 11:00 p.m. and 6:30 a.m., provided further that this premium shall not be payable for any hours worked for which the time and one-half overtime rate is payable.

(C) Service clerks will receive Sunday and holiday premiums as follows:

0 - 2 months of service - none.
3 - 12 months of service - $1.00 plus their regular hourly rate.
+12 months of service - time and one-half their regular hourly rate.

Service clerks will receive time and one-half their regular hourly rate for Sunday and holiday work based on the above schedule or promotion to another classification whichever occurs first.

Service Clerks hired after August 11, 2006, shall receive premiums for work on Sundays and holidays as follows:

Sunday
0 - 12 months = $1.00 per hour;
13 - 24 months = $2.00 per hour;
25 months and over = $2.50 per hour.

Holidays
0 - 12 months = $1.25 per hour;
13 - 24 months = $2.00 per hour;
25 months and over = Time and ½ per hour.

(D) Night crew clerks will receive a fifty cents ($0.50) per hour premium added to their appropriate rate and night crew chiefs will receive a forty cents ($0.40) per hour premium in addition to the night crew premium added to their appropriate rate.

## Section 3.5 Pyramiding of Overtime and Premium Pay Prohibited

Premiums paid for Sunday work, holiday work or for undesirable hours shall not be duplicated and only the higher of two available premiums will be paid. However, where a "third person" or a Dairy/Frozen Food Manager works on Sunday, they shall be paid time and one-half (1-1/2) their regular hourly rate plus the appropriate premium. Premium hours paid at time and one-half (1-1/2) straight-time rate or in excess shall not be counted in computing daily or weekly overtime. Overtime hours paid on a daily or shift basis shall not be included in calculating overtime on a weekly basis. Payment for hours not worked such as holiday pay, vacation pay, jury pay, funeral pay or similar pay shall not be counted as hours worked in calculating weekly overtime.

## Section 3.6 Call-In Pay

Any full-time employee who reports to work upon request shall be guaranteed a minimum of four (4) hours work or four (4) hours pay in lieu thereof at his/her regular hourly straight-time rate. Part-time clerks called in to work and who report shall receive a minimum of four (4) hours work or the equivalent pay in lieu thereof provided they are available to perform the work. Part-time employees shall be called in for additional hours in accordance with seniority and type of work within the store they work.

The call-in guarantees are subject to the employees' availability to work the guaranteed hours, nor shall such guarantee be applicable due to disruption of normal store operations by conditions beyond the control of the Employer, such as Acts of God, civil commotion, fires, work stoppages due to strikes, or governmental intervention.

No employee shall have his/her scheduled hours reduced due to a call-in unless notice of schedule reduction is given at the time of the call-in.

## Section 3.7 Full-Time Employment Required When Practicable

It is the intent of the parties that two employees shall not be employed on a part-time basis when it is practicable to employ one employee on a full-time basis. Therefore, if two part-time employees in the same job classification are regularly working a combined total of forty (40) hours, or more, on a split week basis, then the Employer shall employ one person on a full-time basis. The selection of such employee shall be in accordance with Article 7, Section 7.5.

## Section 3.8 Out of Classification Work

In the event an employee is required to work temporarily in a lesser paying job, he/she shall not suffer a reduction in pay while on such temporary assignment.

## Section 3.9 Scheduling of Part-Time Employees

A. Part-Time Regular Clerks, Part-Time Bakery Clerks, and Part-Time General Merchandise Clerks

Part-time regular clerks, part-time Bakery clerks and part-time General Merchandise clerks will be scheduled for hours of work in accordance with seniority and the type of work they do within the store in which they work. More senior part-time employees will maintain a reasonable difference in the number of hours they are scheduled each week as compared to less senior part-time employees. To ensure an equitable spread of scheduled hours to acknowledge seniority within an employee's current classification, the following schedule will be followed:

| Completed Years of Service in Current Classification | Minimum Scheduled Hours |
|---|---|
| 0 - 4 years | 12 |
| Start of 5th – 9 years | 15 |
| Start of 10th – 14 years | 19 |
| Start of 15th year | 23 |

4

Any hours of work in addition to the above, whether occasionally or seasonally or permanently available, will be distributed to part-time employees by seniority in accordance with the type of work they do within the store.

The Employer expressly retains the right to determine the size and composition of the work force for the continued efficient operation of the store.

B. Service Clerks, Bulk Food Clerks and Salad Bar Clerks

(1) Service Clerks, Bulk Food Clerks and Salad Bar Clerks will be scheduled a minimum of twelve (12) hours per week in the store in which they work. However, this shall not apply to an employee called in to replace another employee or to an employee whose available hours are beyond the Employer's control, or to an employee called in to work when fewer than twelve (12) available hours remain in the week.

(2) Qualified Service Clerks, Bulk Food Clerks and Salad Bar Clerks shall be scheduled for available hours in accordance with seniority and type of work within the store they work. It is agreed that the Employer may employ such Service Clerks, Bulk Food Clerks and Salad Bar Clerks as may be required for the efficient operation of the store.

C. Part-time employees shall be scheduled for a minimum of four (4) hours in any one (1) day, provided they are available for work.

### Section 3.10  Dress and Appearance Code

The Employer after consultation with the Union may adapt and implement a dress and appearance code for store personnel in the interest of presenting a clean and neat appearance on behalf of store personnel. The Union shall be furnished copies of the code adopted and shall be consulted prior to any major changes in said code.

### Section 3.11  Office Work

An office premium shall be paid to the designated office "third person" in the amount of forty cents ($0.40) per hour for all work performed in the office. With the exception of Service Managers, Assistant Service Managers, and third persons, all work performed by an employee in the office shall be on a voluntary basis.

## ARTICLE 4
## WAGES

### Section 4.1  Wage Rates

During the term of this Agreement, the Employer agrees to pay not less than the minimum wage rates set out in Appendix A attached hereto.

### Section 4.2  Manager Relief

Whenever an employee is assigned to and assumes the responsibility of the manager for a full calendar workweek, he/she shall be paid the minimum drawing account paid to managers or the employee's rate, [including time and one-half (1-1/2) for hours worked in excess of eight (8) hours per day or for hours in excess of forty (40) per week], whichever is greater.

### Section 4.3  Receiving Clerk

Any employee, whether full-time or part-time, who has been designated as Receiving Clerk, shall receive forty cents ($0.40) per hour in addition to their applicable hourly rate of pay. It is further understood and the parties hereby stipulate and agree that this is not a mandatory position.

### Section 4.4  Scan Coordinators and Personnel Coordinators

The Employer may designate an employee to fill a store position entitled Scan Coordinator and/or a store position entitled Personnel Coordinator. These positions shall be at the discretion of the Employer and such positions shall not be mandatory. The Employer shall provide to such designated employees a forty cents ($0.40) per hour premium for each hour primarily performing Scan Coordinator or Personnel Coordinator work.

### Section 4.5  Relief of Department Heads

(A) Relief Pay
Whenever a full-time employee is assigned to and assumes the responsibilities of a duly appointed department head, namely, Assistant Manager, Produce Manager, or Service Manager, for a full calendar week, he or she shall receive the minimum contract rate for that week's work including overtime, if any, or his or her regular rate of pay.

(B) Mandatory Relief
Whenever it is known in advance that an Assistant Manager, Produce Manager or Service Manager will be absent for a calendar week or more, a member of the bargaining unit shall be assigned the position and handled in accordance with paragraph (A) above.

### Section 4.6  Recording of Time Worked

Each employee shall accurately record the daily time worked by him or her using the Time and Attendance System provided by the Employer.

### Section 4.7  Employer Meetings - Required Attendance

When an employee is required to attend a meeting called by the Employer he/she shall be paid for all time in attendance at the meeting. Those employees who attend a required meeting and who are not scheduled to work on the day of the meeting or who have already completed their shift and left the premises shall be paid one (1) hour minimum pay.

### Section 4.8  Previous Comparable Experience

Former Jewel Food Store employees who were Local 881 members who are re-hired within twenty-four (24) months of their date of separation will be given up to a maximum of thirty-six (36) months credit for previous experience. This Section applies only for the purpose of determining such employees wage rate. Former Jewel Food Store employees, who were never effected by a part-time wage cap during their previous employment, will not be placed at the capped rate upon re-employment if they are re-employed under the terms and conditions of this section.

Employees who change from full-time status to part-time status [within three (3) years of becoming a full-time employee] shall go to the appropriate part-time wage rate equal to the length of service and qualify under the part-time benefits rules. This applies only when there is no break in service.

5

# ARTICLE 5
## VACATIONS, HOLIDAYS & ABSENCE LEAVES

### Section 5.1 Length of Vacation

All employees who meet the qualifications shall be entitled to a vacation with pay in accordance with the following schedule:

(A)

| Number of Completed Years of Continuous Service | Number of Weeks of Vacation with Pay |
|---|---|
| 1 year | 1 week |
| 2 through 6 years, inclusive | 2 weeks |
| 7 through 11 years, inclusive | 3 weeks |
| 12 through 19 years, inclusive | 4 weeks |
| 20 through 24 years, inclusive | 5 weeks |
| 25 or more years | 6 weeks |

(B) For Full-time employees hired after August 11, 2006

| Number of Completed Years of Continuous Service | Number of Weeks of Vacation with Pay |
|---|---|
| 1 year | 1 week |
| 2 through 6 years, inclusive | 2 weeks |
| 7 through 11 years, inclusive | 3 weeks |
| 12 years or more | 4 weeks |

(C) For Part-time employees and Service clerks hired after August 11, 2006

| Number of Completed Years of Continuous Service | Number of Weeks of Vacation with Pay |
|---|---|
| 1 through 3 years, inclusive | 1 week |
| 4 through 6 years, inclusive | 2 weeks |
| 7 years or more | 3 weeks |

### Section 5.2 Vacation Qualifications

(A) Full-Time Employees

   (1) First Vacation

      Full-time employees hired in the preceding year may take their first vacation in the current year ahead of their service anniversary date subject to their refunding all vacation payments in the event they do not complete a full anniversary year of employment.

   (2) Second and Succeeding Vacations

      Once a full-time employee has qualified for his/her first vacation, he/she shall thereafter qualify for all succeeding vacations as of January 1 of the current year for a vacation based on his/her length of service to be completed during the current year subject to the adjustment set out in Section 5.5 in the event the employee does not complete his/her anniversary year of service.

(B) Part-Time Employees

   Part-time employees shall qualify for all vacations after completion of an anniversary year.

### Section 5.3 Vacation Pay

(A) Full-Time Employees

   A week's vacation pay for full-time employees shall be in the amount of the employee's standard scheduled workweek.

(B) Part-Time Employees

   A week's vacation pay for part-time employees shall be calculated by multiplying 1/52 times the employee's hours worked and vacation paid during the preceding anniversary year times the rate in effect on his/her anniversary date. For the year in which an employee is transferred from part-time to full-time, he/she shall be paid for his/her vacation as a part-time employee.

### Section 5.4 Vacation Administration

(A) Vacation Schedules

   All vacations shall be subject to the necessary scheduling of replacements by the Employer which may limit the number of employees who may be on vacation at any one time. Preference in the choice of earned vacation dates shall be given on the basis of seniority within each store, first choice going to the employee with the greatest length of continuous full-time service and so on.

(B) Calendar Weeks

   All vacations shall be for calendar weeks, except as provided for below. Choice of vacation dates shall be on the basis of seniority within the store.

   Effective January 1, 2007, Full-time employees who are eligible for two (2) or more weeks of vacation may use one (1) week of their vacation one (1) day at a time as mutually agreed to by the employee and the employer. The day must be agreed to two (2) weeks in advance of the work schedule being posted. Full week vacations will have preference over single days. Employees must advise the Store Director by the second week of January each year if they are using one (1) week of vacation one (1) day at a time. If a vacation week is divided, it may not be used during holiday weeks, and the single vacation day(s) must be used by December 1 of each calendar year.

   Effective November 15, 2011, all employees with two (2) weeks vacation shall be eligible for the above provision for vacation one (1) day at a time, that is, they may use one (1) week of their vacation, one (1) day at a time as mutually agreed to by the employee and the employer. Part-time employees shall continue to receive their minimum hours per Section 3.9 (A).

(C) Holidays Within Vacations

   Whenever a holiday recognized under this Agreement falls within an employee's vacation period the employee shall receive an extra day's pay or subsequent day off at the Employer's option.

### Section 5.5 Adjustment of Vacation Pay in the Event of Layoff or Separation from Service

Any full-time employee who is laid off or who leaves service prior to his/her first service anniversary shall forfeit all vacation pay with respect to that year of service and shall refund any vacation pay received by him/her with respect to such year.

Any full-time employee who is laid off or leaves service after his/her service anniversary shall, unless he/she was discharged for gross misconduct in connection with his/her work (namely, stealing, malicious

6

Case 2:12-cv-06063-LS Document 24 Filed 01/13/15 Page 27 of 77 Page ID #:34

vandalism, or other serious misconduct) he is entitled to vacation pay at the rate of one-twelfth (1/12th) of the vacation pay to which he/she was entitled at his/her last anniversary date for each full month of service completed since his/her last anniversary date plus any earned vacation not taken. If a full-time employee is laid off or is separated from service and is entitled to vacation pay as set out above, he/she shall be paid such vacation pay within two (2) weeks following the layoff or separation from service.

If a full-time employee has received his/her vacation with pay and is laid off or separated from service prior to his/her anniversary date, he/she shall refund the difference, if any, between the vacation pay received and the vacation pay to which he/she was entitled under the above schedule within two (2) weeks following the date of the layoff or separation from service.

Part-time employees with one (1) or more years of service, who have completed six (6) months service since their last anniversary date shall, unless he or she was discharged for gross misconduct in connection with his or her work (namely, stealing, malicious vandalism, or other serious misconduct), be entitled to a prorated vacation at the rate of 1/12th of their vacation pay for each month's entitlement based on their length of service and rate of pay as of their last anniversary date.

## Section 5.6 Holidays Recognized

(A) The following shall be paid holidays. There shall be no work on Christmas Day and work on all other recognized nationally observed holidays [except as modified by Article 3, Section 3.1(D)] in addition to Easter Sunday shall be on a voluntary basis for all employees, except that if an insufficient number of employees volunteer the Employer may require employees to work in accordance with job classification in inverse seniority order to maintain a qualified staff for operations:

| | |
|---|---|
| New Year's Day | Labor Day |
| Memorial Day | Thanksgiving Day |
| Fourth of July | Christmas Day |

The schedule below shall not apply to Full-time employees hired after August 11, 2006; current language shall apply.

Part-time employees hired after August 11, 2006 shall be entitled to holiday pay as follows:

First Six (6) months = None
7-12 months = 2 Holidays – Thanksgiving Day and Christmas Day
13-24 months = 4 Holidays – Fourth of July, Labor Day, Thanksgiving Day & Christmas Day
25 months and over = All 6 Holidays

Service Clerks hired after August 11, 2006 shall be entitled to holiday pay as follows:

First Twelve (12) months = None
13-24 months = 4 Holidays – Fourth of July, Labor Day, Thanksgiving Day & Christmas Day
25 months and over = All 6 Holidays

(B) Holiday Qualifications

To qualify for holiday pay all employees must work both the regularly scheduled workdays before and after the holiday, except that this requirement shall be deemed to be met if the employee's failure to work said workdays is due to his/her personal illness, injury or other excused cause provided that he/she works at least one (1) day in the workweek in which the holiday falls. Part-time employees who have completed their probationary period shall be entitled to holiday pay.

(C) Holiday Pay, Birthday and Personal Day Pay

Full-time employees working a normal basic workweek who qualify shall receive holiday pay in an amount equal to one-fifth (1/5th) their regularly scheduled standard straight-time workweek. Full-time employees who work a standard workweek of less than five (5) days shall receive holiday pay for their normal scheduled workday in the event such workday is observed as a holiday. For example, a night crew employee working four (4) ten (10) hour shifts who is scheduled off on a regular shift as his/her holiday shall receive ten (10) hours holiday pay for his/her scheduled off shift in addition to his/her normal thirty (30) hours of performed work. However, in the event this same employee is scheduled his/her normal (40) hours in a holiday week he/she shall receive a maximum of eight (8) hours holiday pay in addition to his/her pay for work performed.

Part-time employees who qualify shall receive holiday, birthday, and personal day pay equal to the product of five percent (5%) for all hours worked and paid during the four week accounting period preceding the period in which the holiday falls times his/her straight-time hourly rate in effect in the week in which the holiday falls.

Hours paid for national holidays, birthday and personal days will not be used to reduce a part-time employee's regular weekly schedule. In no case, unless requested by the employee, will non work paid hours be used to meet the regular weekly schedule hours entitlement of the Employee.

(D) Personal Days Off

(1) All employees in service on or before 1/23/83 shall be eligible for four (4) personal days off per calendar year. The entitlement to the four (4) personal days shall be on the basis of one (1) per quarter. Such personal days off shall not be construed as holidays with respect to the holiday workweeks.

(2) Employees hired on or after 1/23/83 shall be eligible for three (3) personal days off per calendar year. The entitlement to the three (3) days shall be on the basis of one (1) per each four (4) month period. Such personal days off shall not be construed as holidays with respect to the holiday workweeks.

(3) Employees hired on or after 1/5/87 shall receive personal holidays as follows:

One (1) personal holiday after the completion of twelve (12) months of employment; one (1) additional personal holiday for a total of two (2) personal holidays after the completion of twenty-four (24) months of employment; such entitlement to be on the basis of one (1) each six (6) month period.

(4) Part-time employees hired after August 11, 2006, shall receive personal holidays as follows:

One (1) personal holiday after the completion of twelve (12) months of employment; one (1) additional personal holiday for a total of two (2) personal holidays after the completion of thirty-six (36) months of employment; such entitlement to be on the basis of one (1) each six (6) month period.

7

Service Clerks hired after August 11, 2006, shall not be
eligible for personal holidays.
Case: 1:13-cv-06615 Document #: 24 Filed: 01/15/14 Page 28 of 77 PageID #:235

It is further understood and the parties hereby stipulate and agree that
any personal holiday taken pursuant to the above must be taken on a
date mutually agreeable to the Employer and the employee.

**(E)** All employees shall be entitled to a Birthday holiday during
their second (2nd) calendar year of employment and each year
thereafter.

Employees hired on or after November 26, 2002, shall be entitled
to their birthday holiday when the employee's birthday occurs
after completion of one (1) year of continuous employment.

Part-time employees hired after August 11, 2006, shall be entitled
to their birthday holiday when the employee's birthday occurs
after completion of two (2) years of continuous employment.

Service Clerks hired after August 11, 2006, shall be entitled to
their birthday holiday when the employee's birthday occurs after
completion of three (3) years of continuous employment.

The day off shall be on the Monday of the birthday week or any
subsequent Monday as mutually agreed upon by the Employer
and the employee. The personal day off in celebration of the
employee's birthday shall not be treated as a holiday for purposes
of the holiday pay provisions covering national holidays.

### Section 5.7 Leave of Absence

Employees shall be entitled to written leaves of absence for the
following reasons:

**(A)** Illness or injury of the employee which results in absence shall
be for a period of six (6) months renewable upon request to a
maximum of one (1) year, provided that once each month after
the first six (6) months the employee notifies the Union and the
Employer of his/her whereabouts and status.

**(B)** Any other reason acceptable to the Employer.

**(C)** Family Leave – Employees are eligible for Family and Medical
Leave as provided by Law. An employee shall, upon written
request, be provided an unpaid leave of absence not to exceed
ninety (90) days in connection with the birth of, or adoption of
a child, or to provide care for a family member due to illness
requiring full-time care.

The employee shall make such request as soon as possible but at
least ten (10) days before the proposed leave of absence, except
in the case of an emergency. A "family member" is limited
to an employee's legal spouse, mother, father, son, daughter,
(including step-parents, step-children, mother-in-law and father-
in-law).

The employee shall provide documentation satisfactory to the
Employer as to the birth or adoption, or existence and nature of
the illness, and the need for such leave.

Such leave of absence shall not constitute a break in the
employee's length of continuous service and the period of such
leave shall be included in their length of continuous service.
Upon expiration of such leave, the employee shall be reinstated
to their previous position.

**(D)** Any employee who is granted a leave of absence and, while
on such leave of absence, accepts employment with another
employer or who goes into business for himself/herself, is
subject to discharge.

**(E)** Any employee on leave of absence or layoff shall not be entitled
to holiday or vacation pay or to any other employee benefit not
accrued at the time of the beginning of the leave of absence or
layoff. Leaves of absence or layoffs which total less than thirty
(30) calendar days in a year of service shall be considered as
time served for the purpose of progression in the wage schedules,
while leaves of absences, including medical and/or injury leaves
of absence or layoffs which equal or exceed thirty (30) calendar
days in a year of service shall operate to defer the effective dates
of each ensuing wage progression or vacation entitlement by the
length of such absence.

**(F)** Return From Leave of Absence - Employees returning from a
leave of absence shall give the Employer seven (7) days notice
in writing indicating their intention to return to work on the date
the leave expires. In such case, if notified prior to the schedule
being posted, the Employer shall schedule the employee on the
schedule for the week following the expiration of the leave. The
employee shall be returned to his/her former job classification,
but not necessarily in the same store.

### Section 5.8 Military and Pregnancy Leaves

Leaves of absence shall be granted for military and pregnancy leaves in
accord with applicable laws. Certification in writing of pregnancy or
military duty call shall be made in the written request for leave prior to
termination of active work. The Employer shall apply the Company's
policy which exists at the time of a Federally mandated military call-up
of military personnel to bargaining unit employees in regard to pay or
health care benefits. It is understood that the company's policy may
vary from time to time and be changed by the Employer without a duty
to bargain.

### Section 5.9 Union Leave of Absence

An Unpaid Union leave of absence may be granted to bargaining
unit employees. Such Union business leave requests shall be made
by the President of Local 881 and directed solely to the Employer's
Labor Relations Department at least thirty (30) days in advance of the
requested leave. The Employer may withhold approval based upon
the Employer's judgment of business needs. Such leave shall not be
available to Department Head positions listed in Appendix A.

### Section 5.10 Jury Pay

When any full-time employee who is covered by this Agreement is
summoned for jury service, he/she shall be excused from work for the
days in which he/she reports for jury service and/or serves. He/she
shall receive for each such day on which he/she so reports and/or serves
on which he/she otherwise would have worked the difference between
his/her regular pay for that day and the payment he/she receives for
jury service, if any; provided, however, that no payment shall be
made under the provisions of this Section to any employee summoned
for jury service unless he/she shall have advised the Employer of
the receipt by him/her of such jury summons not later than the next
regularly scheduled workday after receipt of said summons. Before any
payment shall be made to any employee hereunder, he/she shall present
to the Employer proof of his/her summons for service, and of the time
served and the amount of pay received therefore, if he/she shall have
served as juror. The provisions of this Section shall apply only when an
employee is summoned for jury duty and shall not apply if an employee

Case: 1:19-cv-00619 Document #: 24 Filed: 01/15/13 Page 29 of 77 PageID #:236

volunteers to serve as a jury. When an employee is released for a day or part of a day during any period of jury service, he/she shall report to his/her store for work.

<u>Section 5.11 Funeral Leave</u>

The Employer agrees to pay full-time employees for necessary absence from scheduled work on account of death in the immediate family up to a maximum of three (3) scheduled workdays, provided the employee attends the funeral/memorial service, and that one such calendar day shall be the day of the funeral/memorial service. For purposes of full-time employees the term "immediate family" shall mean spouse, parent, step-parent, child, step-child, grandparent, grandchild, brother, step-brother, sister, step-sister, brother-in-law, sister-in-law, father-in-law, mother-in-law, domestic partner (as per the definition in the employer's Health Care Plan) or any relative residing with the employee or with whom the employee is residing. All part-time employees and Service Clerks shall receive up to a maximum of three (3) days off to attend the funeral/memorial service, and that one such calendar day shall be the day of the funeral/memorial service of a member of the immediate family, and shall be paid at straight-time for the hours scheduled to work on those days, provided that they attend the funeral/memorial service, and that one such calendar day shall be the day of the funeral/memorial service. For the purposes of part-time employees and Service Clerks, the term "immediate family" shall mean spouse, parent, step-parent, brother, step-brother, sister, step-sister, child, step-child, grandchild, domestic partner (as per the definition in the Employer's Health Care Plan) or grandparent.

<u>Section 5.12 Compensable Injuries on the Job</u>

Employees injured on the job shall be paid for the hours scheduled on the day of injury at their normal rate of pay.

# ARTICLE 6
# OTHER BENEFITS

<u>Section 6.1 Retirement Benefits</u>

During the term of this Contract, but without commitment thereafter, the Employer agrees to provide, maintain and administer in full force and effect the Employer's profit sharing retirement plan known as Star 401(k) Plan covering full and part-time employees substantially in the form existing on the effective date of this Agreement, as the same may be changed, altered or amended in accordance with the Trust provisions.

<u>Section 6.2 Health Care Plan</u>

(A) (1) <u>Employer's Health and Welfare Plan</u>
For the term of this Agreement, but without commitment thereafter, the Employer agrees to provide and administer the Employer's Preferred Provider Organization/Medical Program for Jewel employees represented by UFCW Local 881 and maintain the Employer's Preferred Provider Organization/Medical Program subject to the terms and conditions stated therein, as the same may be amended from time to time, for each member in the bargaining unit who qualifies for coverage as hereinafter provided. Effective 11-15-2011 for the plan year 1-1-2012 – 12-31-2012, the SPD changes contained in the documents (ratification materials) concerning Health, Dental and Vision Benefits changes will go into effect. No further SPD changes will take place prior to the end of plan year 12-31-2012. After that, further SPD proposed changes are subject to the provisions of this Section. The Company will provide advance notice to the Union of any Summary Plan Description change and agrees to engage in good faith bargaining, regarding such Summary Plan Description change.

In the event the parties fail to reach agreement, Section 9.1 (No Strike/No Lockout) provision of the Collective Bargaining Agreement shall become null and void and either party is free to exercise their rights therein.

It is understood that the weekly employee contribution rates for the Employer's Preferred Provider Organization/Medical Program shall not exceed the rates listed below:

|  | 6/1/2009 | 11/27/2011 | 1/1/2013 |
|---|---|---|---|
| Single coverage | $14.60 | $15.60 | $16.60 |
| Dual coverage | $25.20 | $27.20 | $29.20 |
| Family coverage | $31.97 | $34.97 | $37.97 |

If 60% or more of the employee and spouse plan members timely complete the Healthy Pursuits Wellness Incentive program, the below increased employee contributions will not have to be paid, as stated in #2(a) and 2(b) below. The Employer's standard non-Healthy Pursuits rate annual adjustment ($400 for single only coverage or $800 for employee with spouse coverage annualized or $7.69 week/$15.38 week) shall apply June 17, 2012 (or later if deemed administratively appropriate by the Employer) for employee and/or spouse plan members who do not timely complete the Health Assessment and Health Screening programs if less than 60% of employees and spouse plan members do not timely complete the Healthy Pursuits Wellness Incentive program. The $7.69 weekly rate adjustment would apply separately to the employee and/or spouse plan member. The $15.38 weekly rate adjustment only applies if both the employee and spouse have not timely completed the Employer's Healthy Pursuit Wellness Incentive program.

** See (A)(2) Healthy Pursuits Wellness Incentive Program e, f and g below.

<u>Non-completed Healthy Pursuits employee contribution rates (without Wellness Incentive)**</u>

|  | 6/1/2009 | 6/17/2012 | 1/1/2013 |
|---|---|---|---|
| <u>Single coverage</u> | $14.60 |  |  |
| (Employee non compliant) |  | $23.29 | $24.29 |
| <u>Dual coverage</u> | $25.20 |  |  |
| (Employee plus spouse) |  |  |  |
| (Employee OR spouse non compliant) |  | $34.89 | $36.89 |
| (Employee AND Spouse non compliant) |  | $42.58 | $44.58 |
| <u>Family coverage</u> | $31.97 |  |  |
| (Employee plus 2 or more) |  |  |  |
| (Employee OR spouse non compliant) |  | $42.66 | $45.66 |
| (Employee AND Spouse non compliant) |  | $50.35 | $53.35 |

HMO options may continue to be available to employees at contribution rates determined by the Company, including Health Payments Weekess Filed: 01/15/ health care, disability, vision, dental, accidental death and Incentive program

during the six (6) month qualifying periods to receive any Filed: 01/15/ health care, disability, vision, dental, accidental death and dismemberment plan, flexible spending account plan(s), and life insurance benefits under the Plan.

**(A) (2) Healthy Pursuits Wellness Incentive Program**

The Employer may provide its normal wellness program, known as "Healthy Pursuits"), as outlined below:

a) Phase 1: (Steps 1 and 2): employee and spouse plan members shall be offered the opportunity to participate in the Employer's Health Assessment and Health Screening programs, on a voluntary basis, with a completion date of May 31, 2012 (or later if deemed administratively appropriate by the Employer);

b) Phase 2: (Step 3): The Employer's Health Screening results and/or Health Program Participation phase shall apply to plan members June 1, 2012 through October 31, 2012;

c) If 60% or more employees and spouse plan members timely complete the Health Assessment and Health Screening as provided in (a) above, the Employer's standard non-healthy pursuit contribution rate adjustments shall not apply from June 17, 2012 through November 17, 2012;

d) If subsection (c) applies and if 60% or more employee and spouse members timely complete the program provided in subsection (b) above, the Employer's standard non-healthy pursuit contribution rate adjustments shall not apply from November 18, 2012 through December 31, 2012;

**e) If less than 60% employee and spouse plan members timely complete the Health Assessment and Health Screening as provided in (a) above, the Employer's standard non-healthy pursuit rate adjustment ($400/$800 annualized or $7.69 week/$15.38 week) shall apply June 17, 2012 (or later if deemed administratively appropriate by the Employer) for employees and/or spouse plan members who did not timely complete the Health Assessment and Health Screening programs;

**f) If less than 60% employee and spouse plan members timely complete the program provided in subsection (b) above, the Employer's standard non-healthy pursuit rate adjustments shall apply November 18, 2012 (or later if deemed administratively appropriate by the Employer) for employees and/or spouse plan members who did not timely complete Steps,1,2 and 3 programs noted above;

**g) If the standard non-healthy pursuit rate adjustments become applicable through either subsection (e) or (f) above, the Company's 2012 standard non-healthy pursuit rate adjustments shall continue after 2012 subject to the outcome of the parties' collective bargaining negotiations for a replacement labor agreement.

The Company's current 2012 wellness program (Healthy Pursuits) shall continue after 2012 subject to the outcome of the parties' collective bargaining negotiations for a replacement labor agreement

**(B)** Qualification for Coverage

(1) All employees must average twelve (12) hours pay per week

(2) Full-Time Employees

To qualify for benefits under the Plan, a regular full-time employee must enroll in the Plan and pay his/her share of the cost.

(3) Part-Time Employees

(a) General Requirements

A part-time employee shall qualify for single part-time coverage upon completion of ninety (90) days of service. Thereafter, a part-time employee must enroll in the Plan and pay his/her share of the cost.

(b) Part-Time Dependent Health Care Coverage

(1) Part-time employees hired after March 29, 1993, will be eligible for single coverage after ninety (90) calendar days of employment and for dependent coverage after one (1) year of employment if they average twenty-eight (28) hours pay per week during each six (6) month qualifying period.

(2) Part-time employees with dependent coverage on or before March 29, 1993, will keep dependent coverage if they average twenty-four (24) hours pay per week during each six (6) month qualifying period.

(3) Part-time employees with single coverage on or before March 29, 1993, may add dependent coverage if they apply for dependent coverage prior to March 29,1993, and meet the requirements contained in sub-paragraph 2 above. If said employees fail to apply for dependent coverage prior to March 29, 1993, they may add dependent coverage later if they meet the requirements contained in sub-paragraph 1 above.

(4) Part-time employees hired on or before March 29, 1993, with no medical coverage because of less than ninety (90) days of employment will be eligible for single coverage if they meet the requirements in paragraph 3 (a) above and will be eligible for dependent coverage if they meet the requirements in sub-paragraph 2 above and if they have enrolled for dependent coverage within 120 days of employment, if not they must meet the qualifications contained in sub-paragraph 1.

(5) Qualification for Coverage

If a full-time employee changes from full-time status to part-time status and the employee had dependent health care coverage on or before March 29, 1993, then the employee will be allowed to sign a waiver to maintain dependent health care coverage. If a full-time employee changes from full-time status to part-time status and the employee

did not have dependent health care coverage on or before March 29, 1993, then the employee will have to average twenty-eight (28) hours during each qualifying period to obtain or maintain dependent health care coverage.

(6) Qualifying periods are the employer's designated semi-annual periods with enrollment at the start of the second month following the semi-annual qualifying period. Coverage shall take effect the first of the month following enrollment. In the event the Employer changes the monthly designated qualifying periods, the employee(s) qualification period shall not be extended as a result of such change.

(C) For employees hired on or after 8/11/2006

All employees must average twelve (12) hours pay per week during the six (6) month qualifying periods to receive any health care, vision (exam), Flexible spending account plan(s).

Short-term disability, vision (hardware), dental, Accidental death and dismemberment plan, and basic life insurance benefits are not available to part-time employees and service clerks hired after 8/11/2006, until completion of sixty (60) months of employment.

(1) Full-Time Employees

To qualify for benefits under the Plan, a regular full-time employee must enroll in the Plan and pay his/her share of the cost. Full-time employees hired on or after 8/11/2006 will be eligible the first of the month following three (3) months of employment.

(2) Part-time (non-service clerks) Single and Dependent Health Care Coverage Hired on or after 8/11/2006.

Part-time employees hired on or after 8/11/2006 will be eligible for employee only coverage with a $150,000 annual maximum and $2,000,000 life-time maximum. After five (5) years of continuous employment, part-time employees hired on or after 8/11/2006 will be eligible for the Employer's standard Preferred Provider Organization/Medical Program for Jewel employees represented by UFCW Local 881.

Part-time, (non-service clerk), employees hired on or after 8/11/2006 will be eligible for single coverage after twelve (12) full months of employment as of the last day of the semi-annual qualifying period for the enrollment process following the semi-annual qualifying period, provided they average twelve (12) hours per week in each six (6) month qualification period. Dependent coverage after sixty (60) months of employment provided they average twenty-eight (28) hours of work per week in each six (6) month qualification period. Eligible employees can enroll during the semi-annual enrollment period following completion of service and hours requirement of the applicable semi-annual qualifying period.

Example: If a semi-annual qualification period is from 7/1/07 through 12/31/07, a part-time clerk needs to have twelve (12) months of completed service as of 12/31/07 to participate in the next semi-annual enrollment process following the 7/1/07 through 12/31/07 qualification period.

(3) Service Clerk employees hired on or after 8/11/2006 will be eligible for employee only coverage with a $150,000 annual maximum and $2,000,000 life-time maximum. After five (5) years of continuous employment, Service Clerks hired on or after 8/11/2006 will be eligible for the Employer's standard Preferred Provider Organization/Medical Program for Jewel employees represented by UFCW Local 881.

Service Clerk employees hired on or after 8/11/2006 will be eligible for single coverage after eighteen (18) full months of employment as of the last day of the semi-annual qualifying period for the enrollment process following the semi-annual qualifying period, provided they average twelve (12) hours per week in each six (6) month qualification period and dependant coverage after sixty (60) months of employment provided they average twenty-eight (28) hours of work per week in each six (6) month qualification period. Eligible employees can enroll during the semi-annual enrollment period following completion of service and hours requirement of the applicable semi-annual qualifying period.

Example: If a semi-annual qualification period is from 1/1/08 through 6/30/08, a service clerk needs to have eighteen (18) months of completed service as of 6/30/08 to participate in the next semi-annual enrollment process following the 1/1/08 through 6/30/08 qualification period.

(4) It is understood that during the term of the contract the weekly employee contribution rates for employees hired on or after 8/11/06 for the first five (5) years of service (single coverage only) shall not exceed the rates listed below:

|  | 6/1/2009 | 11/27/2011 | 1/1/2013 |
|---|---|---|---|
| Single coverage | $11.00 | $12.00 | $13.00 |

If 60% or more of the employee and spouse plan members timely complete the Healthy Pursuits Wellness Incentive program, the below increased employee contributions will not have to be paid, as stated in Section 6.2(A)(2). The Employer's standard non-Healthy Pursuits rate annual adjustment ($400 for single only coverage or $800 for employee with spouse coverage annualized or $7.69 week/$15.38 week) shall apply June 17, 2012 (or later if deemed administratively appropriate by the Employer) for employee and/or spouse plan members who do not timely complete the Health Assessment and Health Screening programs if less than 60% of employees and spouse plan members do not timely complete the Healthy Pursuits Wellness Incentive program. The $7.69 weekly rate adjustment would apply separately to the employee and/or spouse plan member.

11

|  | Non-completed Healthy Pursuits rates (without Wellness Incentive)** | | |
|---|---|---|---|
|  | 6/1/09 | 6-17-2012 | 1-1-2013 |
| Single coverage | $11.00 | | |
| (Employee non compliant) | | $19.69 | $20.69 |

(5) Qualifying periods are the employer's designated semi-annual periods with enrollment at the start of the second month following the semi-annual qualifying period. Coverage shall take effect the first of the month following enrollment. In the event the Employer changes the monthly designated qualifying periods, the employee(s) qualification period shall not be extended as a result of such change.

(6) All time served in any classification shall count towards an employee(s) eligibility for qualification of Health Care coverage.

(7) When employee(s) become eligible for the standard Preferred Provider Organization/Medical Program Plan, the standard weekly employee contribution rates apply.

### Section 6.3 Maintenance of Coverage

Employees on layoff or leave of absence shall maintain their coverage during periods of layoff and leaves by paying the contributions necessary to maintain coverage in accordance with the terms of the Plan. The Union shall be notified of the amounts necessary for maintenance of benefits.

### Section 6.4 Employee Stock Plan

The Company shall provide an Employee Stock Plan as said Plan may be modified or discontinued by the Company at any time.

### Section 6.5 Replacement Plans

In the event that the Employer's' Health and Welfare Plan and/or the Star 401(k) Plan are to be discontinued and/or replaced, the Employer will provide advance notice to the Union and agrees to engage in good faith bargaining. In the event of implementation of a replacement Health Care Plan pursuant to the provisions of Section 6.5 of the current collective bargaining agreement between Jewel Food Stores and UFCW Local 881, the weekly employee contribution rates of a replacement Preferred Provider Organization/Medical Program for Jewel employees represented by UFCW Local 881 shall not exceed the weekly employee contribution rates set forth in Section 6.2(A). If the parties are unable to reach an agreement regarding the discontinuance and/or replacement of either Plan, the provisions of Section 9.1 No Strikes; No Lockouts shall not apply until such time as the parties reach agreement.

# ARTICLE 7
# SENIORITY

### Section 7.1 Seniority and Other Definitions

Seniority means the rights secured by an employee by length of continuous employment service as provided herein. Seniority starts from the last date when the employee is hired by the Employer except that new employees shall not acquire any seniority rights until they have completed a probationary period of thirty (30) days, after which their seniority shall date back to the date of last hiring. The probationary period for employees in new stores shall be thirty (30) days from the date that the store opens. The probationary period for service clerks shall be sixty (60) days.

Service Clerks promoted after March 29, 1993 may, for thirty (30) days following promotion, request to be returned to the job of Service Clerk. If the request is approved by store management, the Service Clerk will be returned to the former job, wage rate, and seniority.

An employee's seniority shall be broken if he/she: (1) quits; (2) retires; (3) is discharged; (4) fails to report after a layoff within seven (7) calendar days after the Employer sends to the last known address known to the Employer a written notification to return to work; or (5) has been out of employment by the Employer for a period of twelve (12) months.

Seniority ranking for employees, hired after March 29, 1993, commencing employment on the same date shall be determined by the day and month of birth. The employee whose day and month of birth is closest to January 1 within the calendar year, shall have the greatest seniority. Employees hired on the same day, on or before March 29, 1993 had their relative seniority determined by the Employer.

### Section 7.2 Seniority Area - Full-Time Employees

For purposes of layoff and recalls after layoff, there shall be the following seniority areas:

Established Zone
North Area
South Area

The Employer agrees to provide the Union with a map outlining the above areas.

The Union and the Employer reserve the right to mutually modify or amend the seniority areas where changes occur in operating conditions which may affect the balance the parties have tried to achieve and maintain.

### Section 7.3 Layoffs and Recalls after Layoffs - Full-Time Employees

Where the employee's qualifications, such as skill, efficiency, and in the cases of such semi-supervisory positions as department heads, the ability to organize, direct and supervise the work of others, are equal, seniority shall control the order of layoffs and recalls after layoffs of full-time employees.

In the event of layoff full-time employees shall have seniority preference over part-time employees and a laid off full-time employee may elect to bump a part-time employee within his/her seniority area. If a full-time employee claims bumping rights in lieu of layoff the Union and the Employer shall resolve the methods to be employed.

The Employer shall determine the relative qualifications of employees, but when the qualifications of employees for the particular job or jobs are equal, this seniority principle requires that:

(A) The employee with the lowest seniority in the job classification in the store shall be the first laid off.

Case: 1:12-cv-06615 Document #: 24 Filed: 01/15/13 Page 33 of 77 PageID #:240

**(B)** The employee being laid off may as an alternative bump that employee in the same job classification with the lowest seniority in the seniority area.

**(C)** No new full-time employee shall be hired in a job classification until all laid off employees in that classification and seniority recall area who are qualified to fill the open job have been given an opportunity to return to work.

**(D)** Qualified laid off employees shall be recalled in the order of their seniority in the recall area in which their store is located.

In the case of semi-supervisory department heads, namely, Assistant Managers, Produce Managers, and Service Managers the Employer may reclassify to full-time clerk status any surplus department heads not required by contract by reclassifying the most junior person in such classification based on continuous employment date. Such reclassified employee may bump the most junior full-time clerk in his/her seniority area if his/her seniority is greater. Other classified positions may also be reduced in accordance with the foregoing process.

## Section 7.4 Layoffs and Recalls after Layoffs - Part-Time Employees

Where fitness and ability are equal, length of service of part-time personnel shall control the order of layoffs and recalls after layoffs on the following basis.

Within an area encompassing the six closest stores to the store where the layoff occurs within the North Area or South Area.

When a store is permanently closed (not relocated) or when a store is destroyed by Acts of God, fire or other reason, part-time employees may exercise their seniority to transfer in their seniority area and displace the most junior part-time employee within such area. Employees exercising their seniority right shall retain their length of service date for vacations and other benefits.

Service Clerks will be treated as a separate classification for purposes of layoff. Accordingly, Service Clerks need not be laid off prior to the laying off of any other classification.

## Section 7.5 Selection of Employees for Full-Time Employment

The Employer will welcome applications for full-time employment from part-time employees with six (6) months or more continuous service. When a full-time clerk is needed, the Employer will endeavor to fill said position by selecting from all applicants, the applicant whose qualifications, ability and availability for work are the greatest; provided, however, that where qualifications are equal, preference shall be given to part-time applicants within the collective bargaining unit on the basis of their length of service. The determination of the relative qualifications of all applicants is expressly reserved to the Employer.

A part-time employee applying for a full-time position will be given an interview with a Human Resource Department representative provided the following criteria have been met.

1) The provisions in this section have been followed and;

2) The Store Director and employee have met and the Store Director has explained to the employee why he/she is not being recommended for a full-time position.

3) All Full-time available "Clerk" through "Department Head" jobs shall be posted in all stores within the seniority area and once the bidding process had ended, the Employer shall disclose who will be filling the posted job, by including that information in the job posting opportunities book.

Where an interview is requested the Store Director should contact the Human Resource Manager to arrange an interview.

## Section 7.6 Promotion of Service Clerks

Where qualifications are equal, seniority shall prevail with respect to the promotion of Service Clerks.

## Section 7.7 Promotion to Supervision

If an employee is promoted from a bargaining unit job to a supervisory position with the Employer, he/she shall continue to accumulate seniority while working in said position for a period of one (1) year. If during said year the employee proves unsatisfactory or deems it to be in his/her best interest, he/she shall be returned to the bargaining unit within the same seniority area at the same job classification and pay rate he/she held prior to his/her promotion, plus the seniority accumulated while working in the supervisory position.

## Section 7.8 Seniority of Employees on Leaves of Absence

The seniority rights of an employee who, either by voluntary action or draft, entered the Armed Forces of the United States shall continue as though he/she had not been absent, and he/she shall have the right to be reinstated to his/her employment as provided by law and regulations thereunder.

An employee who requests and is granted a personal leave of absence by the Employer shall have his/her seniority rights and provisions maintained for the duration of such leave of absence, provided the employee does not hold any other employment while on such personal leave of absence.

## Section 7.9 Seniority Preference

Local Union Officers and one (1) Union Steward in each store shall have seniority preference over all other employees for the purpose of layoffs and recalls after layoff excluding any right to claim higher classified jobs beyond the General Clerk.

# ARTICLE 8
# UNION-MANAGEMENT RELATIONS

## Section 8.1 Union Shop

It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members in good standing on the execution date of this Agreement shall remain members in good standing and those who are not members on the execution date of this Agreement shall on the thirty-first (31st) day following the execution date of this Agreement become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its execution date shall, on the thirty-first (31st) day following the beginning of such employment become and remain members in good standing in the Union. The Employer may secure new employees from any source whatsoever.

During the first thirty (30) days of employment, a new employee, except service clerks, shall be on a trial basis and may be discharged at the discretion of the Employer. Service clerks, during the first sixty (60) days of employment shall be on a trial basis and may be discharged at the discretion of the Employer.

13

Case 3:23-cv-00165-JSC Document 22-4 Filed 01/15/13 Page 34 of 77 PageID.#:241

The Employer agrees to notify the Union in writing within thirty (30) days from the date of first employment or all new employees subject to this Agreement, to include the name and residence address of such employee, and the store in which employed.

The Union agrees to admit to and retain in membership all employees who have served a trial period of thirty (30) days and proven satisfactory to the Employer as prospective permanent employees without discrimination so long as such employees tender the initiation fees and periodic dues uniformly required for membership and maintain their membership in good standing in the Union. In the event that an employee fails to tender the initiation fee or periodic dues uniformly required as a condition of acquiring or retaining membership or if such employee fails to maintain membership in good standing, the Union will notify the Employer in writing and the Union member will be given not less than two (2) weeks time in which to re-establish his/her membership in good standing before the Employer shall be called upon to release him/her.

## Section 8.2 Union Dues Checkoff

The Employer agrees to deduct the uniform dues and initiation fees from the paychecks of those covered employees whose individual written unrevoked authorizations are on file with the Employer and to transmit the amounts so deducted to the Union. Said deduction authorizations shall be in such form as to conform with Section 302(c) of the Labor Management Relations Act of 1947.

## Section 8.3 Active Ballot Club Checkoff

The Employer agrees to deduct contributions in an amount designated by the employee from the paychecks of those employees whose individual written unrevoked authorization are on file with the Employer and to transmit the amounts so deducted to the Union. Said deduction authorizations shall be in such form as to conform with all governing Federal and State law applicable to Political Action Committees.

## Section 8.4 Indemnification

The Union agrees to defend, protect, indemnify and save the Employer harmless against any claim, demand, suit or liability that shall arise out or by reason of any action taken by the Employer in reliance upon a request made by the Union to discharge an employee for failure to maintain his/her membership in good standing pursuant to Section 8.1, or upon employee payroll deduction authorization cards submitted by the Union to the Employer under Section 8.2.

## Section 8.5 Union

The Union for and on behalf of itself and its members agrees that its members shall perform the work assigned to them from time to time by the Employer and shall work for the best interest of the Employer in every way just and lawful, giving honest and diligent service to the patrons of the Employer and to each other.

## Section 8.6 Union Stewards and Business Representatives

The Union shall have the right to designate a steward for each store. The Union shall keep the Employer informed as to the names of the stewards currently authorized to represent the Union and shall provide the Employer with a list of stewards at least once every ninety (90) days.

The Union business representatives shall be admitted to the Employer's store premises during the hours employees are working for the purpose of ascertaining whether or not this Agreement is being observed. Such activity shall be conducted in such a manner as not to interfere with the orderly operation of the Employer's business, it being further agreed that lengthy discussions between employees and representatives of the

Union, including the shop steward, or among themselves, concerning disputes shall not take place during working hours.

In case of disputes as to wages, the Employer agrees to show an authorized representative of the Union bona fide copies of the employee's wage records.

## Section 8.7 Union Officers and Stewards

Union officers and stewards, upon request made from Union headquarters to the Employer, shall receive time off without pay for the conduct of Union business. Such request must be made at least thirty-six (36) hours in advance of the expected absence. Such time off shall be treated as an authorized leave of absence.

## Section 8.8 Stewards Conference

Local 881's Union Executive Board Members and the most senior Union Steward in each store will be granted the day off with pay to attend the Local 881's Annual Stewards' Conference. The total number of stewards who will be eligible for compensation shall not exceed two hundred (200).

## Section 8.9 Display of Contract and Union Shop Cards

The Employer agrees to keep a copy of this Agreement, which shall be furnished by the Union, posted in each store at a place where every employee may have equal and easy access to same. The Employer also agrees to display one Union shop card of a reasonable size in all stores. The Employer agrees employees may wear their Union button during working hours.

## Section 8.10 Employee Lists

The Employer will continue its current practice of reporting employees to the Union on a weekly basis via magnetic media, direct transmissions, or such other manner as may be agreed upon by the parties.

January 1st of each year, the Employer agrees to post in each store a list showing the names and employment dates of all full-time and part-time employees in the store. The store seniority list shall be maintained on a current basis by the store steward.

## Section 8.11 Management Rights

The management of the business, including the right to plan, determine, direct and control store operations and hours, the right to study and introduce new methods, facilities and products, the right to direct and control the work force, including the determination of its size and composition, the scheduling and assignment of work, and also including the right to hire, assign, demote, promote and transfer to lay off or reduce the hours of work because of lack of work, to discipline, suspend or discharge for proper cause, and to establish and maintain reasonable rules and regulations covering the operation of the store, a violation of which shall be among the causes for discharge, is vested in the Employer; provided, however, that these rights shall be exercised with due regard for the rights of the employees and provided further that they will not be used for the purpose of discrimination against any employees. The listing of specific rights in this Agreement is not intended to be, nor shall it be considered restrictive or a waiver of any right of management not listed and not specifically surrendered herein, whether or not such rights have been exercised by the Employer in the past.

## Section 8.12 Discipline

During an employee's (other than Service Clerks) probationary period, that is, during his/her first thirty (30) days of employment, he/she may

14

Case 1:12-cv-06613 Document 24 Filed: 01/15/13 Page 35 of 77 PageID #:242

During a service clerk's probationary period, that is, during his/her first sixty (60) days of employment, he/she may be discharged for any reason at the sole discretion of the Employer. After an employee has completed the probationary period, such employee shall not be suspended, discharged or otherwise disciplined, without just cause, just cause to include but not be limited to the following: continuing poor performance on the job, whether due to inefficiency, loafing, carelessness or incompetence; dishonesty or other misconduct in connection with work; incivility; insubordination; serious or persistent infraction of reasonable rules promulgated by management relating to the operation of the store or the health or safety of employees; engaging in a strike, work stoppage, slowdown or picketing in violation of this Agreement; provided, however, that in the event of a dispute as to whether a suspension, discharge or other disciplinary penalty was for just cause the matter shall be adjusted in accordance with the grievance and arbitration provisions of this Contract.

It is further agreed that stewards will grant up to thirty (30) extra days of probationary employment if requested by store management for full-time and part-time employees. Any extension to the probationary period will be in writing signed by the Employer, the Union and/or Steward and the affected employee.

### Section 8.13 Picket Lines

Employees may refuse to cross a lawful primary picket line involving Jewel Food Stores, Inc., and United Food and Commercial Workers Union, Local 881, provided the same has been sanctioned by Local 881.

### Section 8.14 Clerks Work Jurisdiction

It is agreed that salespeople shall not handle or stock any merchandise in the grocery, produce, general merchandise department other than as it exists under prevailing practices. Multi-day soda deliveries on Saturday may be worked by the vendor on Saturday and Sunday. The Employer may adopt any Union approved Dominick's vendor practice or practices in the Chicagoland area. This limitation shall not apply to new stores during the first week after the store is opened, nor shall it be applicable during the first week after a major remodeling.

### Section 8.15 Discrimination

The Union and the Employer agree to continue their respective practices of non-discrimination on the basis of race, color, creed, union activity, sex, or national origin.

### Section 8.16 Automation

During the term of this Agreement the Employer agrees that prior to the introduction of any available new technological equipment which substantially affects work performed by the bargaining unit, the Employer will first give notice to the Union of its intent to utilize such equipment and prior to the implementation the Employer agrees to discuss with the Union all relevant data available concerning such equipment and the Union expressly reserves the right to bargain fully the impact of such implementation including, but not limited to, retraining of personnel, job relocation of personnel, and any and all aspects affecting the employment status of the covered employees.

It is expressly agreed that test utilization of equipment on a limited basis is not precluded provided the Union is given advance notice of the test and is given access to the data developed through such a test.

If and when discussions become necessary it will be the mutual express intent of the parties to preserve the employment opportunities of present personnel if affected by the utilization of new equipment.

### Section 8.17 Service Clerk Duties

Sorting, bagging, and packaging sold merchandise, sweeping and cleaning parking lot and other adjacent areas outside the store, sweeping floors anywhere in the store, carrying and loading sold merchandise, emergency cleanups, snow removal, maintenance of lawns and shrubs, returning shopping carts to the store, filling bag racks, cleaning areas around and in front of the checker lanes, cleaning rest rooms and lunch room, collecting and sorting bottles disposing of trash and rubbish, washing windows and putting up window bills and signs, floor cleaning and maintenance throughout the store, price check and product check, returning customer overstock, facing shelves and washing and cleaning shelves and cases, and demonstrating with the understanding that service clerks will not be hired for the sole purpose of demonstrating.

During the following times, Service Clerks may be assigned to the Flower Shop provided that current Flower Shop employees are not displaced for hours or denied hours they could work:

The day before Easter and Easter Sunday
Valentine's Day
Mother's Day
Sweetest Day
The day before Thanksgiving and Thanksgiving Day
The two days before Christmas
The two weeks which contain "Floral Spectaculars"
Floral areas outside of the store (i.e. watering, clean-up, maintenance)

The following understandings are to continue as to the service clerk classification:

A)   Service clerks will be readily identifiable.
B)   The Employer will cooperate with the Union in policing the stores in order that the full intent of the service clerk classification is enforced.

### Section 8.18 Violation of Service Clerk Duties

It is agreed that service clerks are not to perform any duties other than those which are set forth in this Agreement. In that regard, it is further agreed that the Employer will post a notice in each store instructing all employees of the service clerk's duties and that the following penalties will apply in the event of any proven violations with the further understanding that each individual store shall be treated separately and that this provision is to be administered on a contract year basis:

1.   Upon the first proven violation in a store, the Union will submit a written notice to the Employer with a copy to the store manager of the store involved in the violation.

2.   Upon the second proven violation in the same store, the service clerk in the store involved shall be paid the next higher regular clerk rate of pay for all hours worked in the week or weeks in which the violation occurred, including hours worked in performance of service clerk duties.

3.   Upon the third proven violation in the same store, all service clerks in the store involved shall be paid the next higher regular clerk rate of pay for all hours worked in the week or weeks in which the violation occurred, including hours worked in performance of service clerk duties.

4.   Upon the fourth proven violation in the same store, all service clerks in the store involved shall be paid double the service clerk rate for all hours worked in the week or weeks in which the violation occurred, including hours worked in performance of service clerk duties.

Case: 1:12-cv-06615 Document #: 24 Filed: 01/15/13 Page 36 of 77 PageID #:243

In the event that the Labor Relations Department receives notice, either by correspondence or otherwise, from the Social Security Administration ("SSA") indicating that some of its employees' names and Social Security Numbers ("SSN") that the employer reported on the Wage and Tax Statements (Forms W-2) for the previous tax year do not agree with SSA's records, the employer agrees to the following:

I.    The Labor Relations Department will notify the Union upon receipt of any such notice and will provide a copy of the notice to all employees listed on the notice and to the Union; and

2.    Any employee whose Social Security status is questioned by the "SSA" will be allowed fourteen (14) calendar days to remedy the problem without loss of job status or tenure so long as they inform the Employer of their intentions. The Employer may remove an employee from the work schedule pending resolution of the Social Security issue and terminate employment if an employee's Social Security status is not resolved by the end of the fourteen (14) calendar day period.

# ARTICLE 9
# NO STRIKES; NO LOCKOUTS;
# GRIEVANCES & ARBITRATION

## Section 9.1 No Strikes; No Lockouts

The Union and the Employer agree on the need for the continuance of their service to the public without interruption. Both recognize this objective as necessary to the security of the Employer and its people. Both, therefore, specifically pledge themselves to help assure that security by using the procedures agreed upon between them for the adjustment of disputes and grievances in all cases where there is any difference of opinion concerning the rights of either under this Contract or the interpretation or application of any provision of it. Therefore, during the term of this Agreement there shall be no strikes, stoppages, diminution or suspension of work of any kind whatsoever on the part of the Union or its membership; nor shall there be any lockout on the part of the Employer.

## Section 9.2 Grievances

(A)    Grievance Defined
A grievance is hereby defined as any dispute involving the interpretation or application of the provisions of the Contract.

(B)    Procedure
A grievance may be initiated by any individual employee, by the Union or by the Employer. Once initiated, the following steps shall be taken to settle such grievance:

Step 1:
By conference between the aggrieved employee, the store steward, or Union representative, and the Store Director or the Assistant Store Director. Failure to resolve or respond to a Step 1 grievance within thirty (30) calendar days of it becoming a Step 1 grievance will automatically advance the grievance to Step 2. The grievance shall be reduced in writing by the Union. The grievance shall include the date of the conference between the Union representative and the Store Director.

Step 2:
By conference between a Union representative and the Associate Relations Manager or such other official as the Employer may designate to represent it in such conference. Failure to resolve or respond to a Step 2 grievance within thirty (30) calendar days of it becoming a Step 2 grievance will automatically advance the grievance to Step 3.

Step 3:
By conference between the President of the Union or his designate and the Labor Relations official of the Company. Failure to resolve or respond to a Step 3 grievance within thirty (30) days of it becoming a Step 3 grievance provides the parties with the right to advance the grievance to the arbitration level. Grievances involving only one (1) store shall be introduced only at Step 1, while grievances involving more than one (1) store may be introduced at any Step. All grievances shall be investigated and answered promptly.

(C)    Time Limits on Grievances
Any grievance involving a claim of improper discharge or other discipline must be presented within seven (7) days after discharge or disciplinary action. All other grievances excluding discharge or disciplinary action must be made within thirty (30) calendar days after the cause giving rise to the grievance becomes evident. Wage claims involving the proper application of wage rates shall not be valid and collectible for a period earlier than 180 calendar days prior to the date of filing the claims. Grievances involving improper scheduling must be filed within the work week in which the violation occurs in order that the Company can correct such violations without incurring a back pay liability.

## Section 9.3 Arbitration

(A)    Either the Union or the Employer may, within thirty (30) calendar days after failure to adjust the grievance in accordance with the grievance procedure, serve upon the other party a written demand for arbitration stating the issue to be arbitrated. The parties hereby agree to use a permanent panel of seven (7) arbitrators who have been selected during the term of this agreement.

The arbitration panel shall constitute seven (7) arbitrators, selected by mutual agreement, as set forth below:

The arbitrators shall be listed alphabetically on the permanent panel. When a grievance is submitted to arbitration the Union will notify the next arbitrator on the list of his/her appointment, with a copy of the notice to the Company. The first grievance submitted to arbitration will be assigned to arbitrator #1; the second grievance submitted to arbitration will be assigned to arbitrator #2, and so forth, before returning to #1 after the seventh grievance. If for any reason, an arbitrator is unable or unwilling to hear a particular grievance, the next arbitrator on the list shall be assigned the grievance.

If for any reason an arbitrator is unwilling or unable to be or remain on the permanent panel, the parties will mutually agree to select a replacement arbitrator. Except as set forth above, no arbitrator shall be replaced by any party during the term of the Contract.

If an arbitrator is unable to hear the grievance for any reason or is unable to offer the parties available dates within 60 days or as soon as practicable, from the date of their selection, the parties shall notify the next arbitrator on the list of their appointment to hear the grievance.

(B)     The arbitrator shall commence hearings as quickly as possible after his/her selection and shall render his/her award in writing together with his/her written findings and conclusions as quickly as reasonably possible after the hearing, in any event, within sixty (60) days of the close of the hearing. The award shall be final and binding upon the parties to this Agreement and upon the complaining employee or employees, if any.

The arbitrator shall have no power to determine arbitrability nor to add or subtract from, modify, or amend any provision of this Agreement, nor to substitute his/her discretion for the discretion of the Union or the Employer, change existing wage rates, or arbitrate proposals for the amendment or renewal of this Agreement.

The arbitrator's fees and expenses, the cost of any hearing room and the cost of a court reporter and of the original transcript shall be borne equally by the parties. All other cost and expenses shall be borne by the party incurring them.

(C)     For the purpose of entertaining a written request from either of the parties for rehearing to correct any material error of omission or commission, ambiguity, or question of application allegedly evident in the opinion or award the arbitrator shall, for a period of seven (7) calendar days next following the date of his/her award, retain jurisdiction of the matter submitted to arbitration by the parties hereto, and until the expiration of the period of time stated in this provision for rehearing the award shall not be deemed to have been issued. If, however, no request for rehearing is duly filed within this seven (7) day period, this award shall be deemed to be issued effective as of its date. A written request for rehearing shall detail the specific grounds relied upon for alleging a material error, or ambiguity, and a copy thereof shall be mailed by certified mail to the other party or parties. If the written request is postmarked no later than the seventh (7th) day next following the date of this award, it shall extend the jurisdiction of the arbitrator for a period of seven (7) days next following the date of the written request. Within those seven (7) days the arbitrator, having re-examined the matter, shall in writing either reject the request for a rehearing or set a date for the requested rehearing. If the request for rehearing be denied, this award shall thereupon be deemed to be issued effective that date and the jurisdiction of the arbitrator shall accordingly cease. If the request for rehearing be granted, the jurisdiction of the arbitrator shall continue until issuance of a final amended award incorporating or rejecting the substances of the allegations contained in the request.

(D)     The participation by the parties in an arbitration proceeding under this Agreement shall not be deemed a waiver of or prejudicial to the right of either party to contest the arbitrability of the grievance or the jurisdiction and authority of the arbitrator in proceedings to set aside the award or in other appropriate proceedings in any State or Federal Court of competent jurisdiction; provided such judicial proceedings are instituted within thirty (30) days of the date of the arbitrator's award.

## MISCELLANEOUS PROVISIONS

### Section 10.1 New Store/Re-Grand Opening Hiring Procedures

In the case of a new store opening that is a replacement for one or more stores that are closing, staffing of clerks for the new store will be accomplished by promoting currently employed service clerks from the old store(s) by seniority until the number of clerks' positions in the new store(s) are filled. Any service clerk from the old store(s) who has given the Employer written notice that he/she does not wish to be promoted to a clerk's job or if the currently employed service clerk has a Special Employee Performance Review which has been administered within the last ninety (90) days in their file, will not come under consideration for promotion to a clerk at the new store but will, rather, transfer to the new store as a service clerk keeping their seniority in tact.

Employees from surrounding stores who wish to be considered for transfer to a new store should make their request in writing to the Area Human Resource Department. All written requests will be given consideration. When a new store opens, employees, living in the area of the new store will be given consideration relative to the staffing of that new store.

### Section 10.2 Travel Hardships

It was agreed that full-time employees who are incurring substantial hardship due to store location or assignment, may request a transfer to a store closer to their home, and to the extent such transfers may be accomplished, every effort will be exerted by the Employer. It is additionally recognized that the staff needs of the particular stores will be paramount in the handling of such transfer request.

### Section 10.3 New Methods - New Job Classifications

In the event the Employer makes major operational changes which result in the layoff or job diminishment of present personnel, such action shall be predisccussed with the Union prior to implementation, and the Union reserves the right to bargain over the impact of such action on the employees affected. This contemplates major technological changes among others.

It was further agreed that the Employer shall not institute new job classifications and pay scales for employees covered by the bargaining unit during the term of this Agreement without advance written agreement with the Union.

### Section 10.4 Quarterly Meetings

During the term of this Agreement the parties have agreed to meet quarterly to discuss any problems concerning the application of the current contract between the parties or any other mutual problems which either party may wish to discuss.

### Section 10.5 Emergency Call In Policy

It is agreed that the following pay policies shall cover the types of emergency call ins set out in the policies as follows:

It is the Store Director's responsibility to respond to calls to the store outside of store operating hours to investigate such things as fire and burglar alarms, refrigeration failures, etc., to the extent possible. However, where it becomes necessary to delegate this responsibility to another employee, the employee shall be paid at the time of time and one-half (1-1/2) the employees prevailing rate of pay or twenty ($20.00) dollars per hour, whichever is greater, for all time the employee is required to be away from home.

## Section 10.6 Transfers

The Employer agrees to continue its policy of paying the Company allowance for employees who are temporarily transferred for the convenience of the Employer.

# ARTICLE 11
## STORE CLOSING

### Section 11.1

In the event the Employer closes or sells a store and employees are terminated as a result thereof, pay equal to one (1) week's pay for each year of continuous service commencing with the third (3rd) completed year for full-time employees and the fifth (5th) completed year for part-time employees, but not to exceed eight (8) weeks pay at their regular rate.

### Section 11.2

Severance pay shall be computed as vacation pay.

### Section 11.3

If a store is sold and the successor Employer offers employment to an employee who is otherwise eligible for severance pay under the terms of this Article and the new job is within twenty percent (20%) of the employees current straight time rate of pay, the employee shall not be eligible for severance pay.

### Section 11.4

In the event of a store closing, employees who are offered jobs within twenty (20%) percent of the employees' current straight time rate of pay and an agreed upon geographic area shall not be entitled to severance pay. Employees who are laid off or are not offered jobs within the geographic area shall be entitled to severance pay as set forth above. In the event the store is sold, the store closing date shall be the last date the Employer operates the store.

### Section 11.5

An employee who is displaced by the transfer of an employee from a closed or sold store shall, if otherwise eligible, be entitled to severance pay benefits applicable to eligible employees at the closed store.

### Section 11.6

The Employer shall offer COBRA (health care coverage) to eligible employees following termination of employment due to a store closing.

### Section 11.7

Severance pay and all other monies shall be due and payable two (2) weeks after the store closing date.

### Section 11.8

An employee who is terminated or laid off and who is eligible for severance pay and accepts severance pay shall not retain seniority or recall rights.

### Section 11.9

The Employer agrees to give the employees and the Union fourteen (14) days notice in advance of a store closing or sale.

### Section 11.10

Employees who are eligible for severance pay and accept a transfer to another job will be paid at the rate of the job accepted. Employees who do not accept a transfer will be separated and not eligible for severance pay.

### Section 11.11

Upon an employee's written request, an employee terminated due to a store closing shall be provided employment information verification (last position held, last rate of pay and employment start/termination dates.)

### Section 11.12

Vacation pay shall be based on the pay rate of the job where the employee spent the majority of their time during the calendar year of the store closing.

# ARTICLE 12
## TERM

### Section 12.1 Initial Term

This Agreement shall become effective on November 15, 2011, and shall expire at 11:59 P.M., January 26, 2013.

### Section 12.2 Renewal Term

If either party wishes to modify this Agreement at its expiration, it shall serve notice in writing of such request upon the other party not less than sixty (60) days prior to the expiration date. In the absence of the service of such notice, this Contract shall automatically renew itself for a period of one (1) year and from year to year thereafter, it being further agreed that the Contract expiration date shall be the last day of the Employer's fiscal year.

## MEMORANDUM OF SUPPLEMENTAL AGREEMENTS

## BETWEEN

## UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL 881

## AND

## JEWEL FOOD STORES , INC.

As a part of the recently concluded negotiations between the parties hereto certain understandings were agreed upon which shall remain in force during the term of the current contract which expires on January 26, 2013, as follows:

### (1)    AVAILABLE HOURS - PART-TIME EMPLOYEES

It was agreed that the Employer will permit qualified and available part-time employees to request permanently available additional hours if they make a written request for same to the Store Director at the time the additional hours become available and if they are in a position to take all of the available hours individually or two or more part-time employees may split the permanently available hours if they are both qualified and available to handle the hours on a permanent basis. Where the qualifications are equal, and two or more part-time employees are individually claiming the permanently available additional hours, the most senior part-time employee will be assigned the hours. It is further agreed that the right to claim permanently open part-time hours is subject to the Employer's maintaining an adequate staff for the continued efficient operation of the store. In the event of a dispute concerning claims for permanently available hours, the matter may be settled through the normal grievance procedure in Article 9 of this Agreement.

**(2)** **FULL-TIME EMPLOYEES — SHIFT PREFERENCE**

It was agreed that full-time employees may use their seniority in a given store for the selection of shift schedules, provided they have the ability to handle the work assignment for that shift. It was additionally understood that employees so selecting favorable shifts will do so on a permanent basis as opposed to weekly or seasonal preferences.

Regular full-time night crew employees shall be given a preference for full-time day openings if they are qualified to perform the day opening work without additional training.

Full-time employees experiencing hardships under present schedules may request a review of schedules where there appears to be a means of removing the hardship without shifting additional burdens on others. In the case of multiple requests by employees for schedule changes or shift preferences in a given location, the most senior employee request shall be the first honored.

**(3)** DEPARTMENTAL INTERCHANGE

General Merchandise employees, and Bakery Clerks may be interchanged and work in any of those respective departments.

## BAKERY AND GENERAL MERCHANDISE SUPPLEMENT

Supplemental Agreement covering bakery department and general merchandise operations entered into between JEWEL FOOD STORES, INC., hereinafter referred to as the "Employer", and the UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 881, hereinafter referred to as the "Union".

Bakery Clerks

Bakery Clerks may engage in any activity involving store bakery operations.

Bakery Chief

It is understood and the parties hereby stipulate and agree that the Employer may designate an employee as Bakery Chief. This is not a mandatory position. If so designated, the Bakery Chief shall be paid the appropriate Bakery Clerk rate plus fifty cents ($0.50) per hour.

Definition:

Bake-Off

The product line relies upon an outside manufacturer who provides semi-finished frozen products which are further processed on the premises before sale.

Section 3.4(A)(6) of the Master Agreement shall not be applicable.

Where bake-off operations are conducted, there may be a supervisory manager (non-bargaining unit) of such shops.

Seniority

For the purpose of layoff and recall after layoff, part-time bakery clerks shall be merged with part-time general merchandise employees. The administration of said layoff and recall after layoff of the aforementioned part-time employees shall be pursuant to Section 7.4 of the Master Agreement.

General Merchandise

The provisions for the night stacking classification of the Master Agreement are inapplicable to general merchandise employees.

It was expressly agreed that it was not the intent of the Employer to have registers in the General Merchandise area used for checking out of grocery products or products normally checked out through the grocery department, but that such registers in the family center area are intended for the sales registration of general merchandise.

Wage Rates

During the term of this Agreement, the Employer agrees to pay not less than the minimum wage rates set out in Appendix A of the master agreement.

Except as herein above modified, amended or altered, all of the terms and conditions of the current Agreement between the UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL 881 and JEWEL FOOD STORES, INC., shall remain in full force and effect, and shall be fully applicable to all stores covered by the Greater Metropolitan Area Agreement.

## FLOWER SHOP SUPPLEMENT

Supplemental Agreement covering flower department operations entered into between JEWEL FOOD STORES, INC., hereinafter referred to as the "Employer", and the UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL 881, hereinafter referred to as the "Union".

**(1)** Wage Schedule

**(A)** Wage Rates

During the term of this Agreement, the Employer agrees to pay not less than the minimum wage rates set out in Appendix A of the master agreement.

**(B)** Part-Time Sales Clerk

A part-time sales clerk is defined for the purpose of this Agreement, as one who bags and packages merchandise, stocks, cleans, cares for plants and fresh flowers, and courteously handles customer service. Such employees will be regularly employed as per the minimum hours scheduled below, and shall be paid according to the following schedule of minimum rates as per Appendix A, Wages.

| COMPLETED YEARS OF SERVICE IN CURRENT CLASSIFICATION | MINIMUM SCHEDULED HOURS |
|---|---|
| 0-4 years inclusive | 12 hours per week |
| 5th and subsequent years | 16 hours per week |

**(C)** Full-Time Sales Clerks

A full-time sales clerk is defined for the purpose of this Agreement as one who is regularly in charge of the Flower Department and responsible for its overall operation. Such employee will be considered a full-time employee and shall be designated either a forty (40) hour or thirty-two (32) hour full-time employee. Thirty-two (32) hours can be scheduled over five (5) days.

**(D)** In stores with flower shops which are over $5,000.00 per week but less than $8,000.00 per week (to be reviewed and adjusted annually) a full-time employee shall be designated as a Senior Designer and shall receive a fifty cents ($.50) per hour premium.

19

(E) The Floral Designer responsible to manage a Floral Department with a weekly sales volume in excess of $8,000.00 (to be reviewed and adjusted annually) shall be classified as a floral Department Manager and paid in accordance with Appendix A.

(2) Seniority
The flower shop employees shall have their seniority by classification within the flower shop operations.

(3) Floral Designers
An employee becomes a designer upon successful completion of the Company's testing program.

Except as expressly modified by the aforementioned changes, all terms and conditions of the Master Agreement shall remain in full force and effect.

## BULK FOODS AND SALAD BAR SUPPLEMENT

Supplemental agreement covering bulk food and salad bar operations entered into between JEWEL FOOD STORES, INC., hereinafter referred to as the "Employer", and the UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 881, hereinafter referred to as the "Union".

(1) This supplement shall be applicable to all employees in the bulk food and salad bar operations.

Upon completion of 24 months of service, Bulk Foods and Salad Bar clerks will be given the opportunity to accept the next opening in the Bakery or General Merchandise or Floral Department classification, and if the employee declines, a note signed by the employee will be placed in that employee's personnel file and the Employer shall have no further obligation regarding transfers.

(2) Conditions
(A) Vacation, holiday and birthday benefits will be the same as for other part-time employees, thus, their date of hire will determine their eligibility for these benefits.

(B) Health care shall be provided pursuant to Article 6 of the Master Agreement.

(3) Seniority
The bulk food/salad bar employees shall be in a separate class for seniority purposes.

(4) Wage Rates
During the term of this Agreement, the Employer agrees to pay not less than the minimum wage rates set out in Appendix A of the Master Agreement.

## LETTERS OF UNDERSTANDING

### Floral Manager

Red circled Floral Designers who bid on and are awarded a Floral Manager's position who have a base wage rate above the published Floral Manager rate will be paid One ($1.00) Dollar over the current published red circle Floral Designer rate.

### Floral Managers and Senior Designers

For the term of this Agreement (11/15/2011 thru 1/26/2013), it is agreed that the following terms and conditions will apply to Floral Manager and Senior Designer positions.

Floral Managers and Senior Designers in their current volume levels as of 1/1/2010 shall not be reduced below their current level for the term of this Agreement. Upon annual review if the sales volume increases to a higher level, the Floral Managers and Senior Designers rates and/or premiums shall be increased to the appropriate level per the Agreement. If sales levels decrease the rates and/or premiums shall not be reduced for the term of this Agreement

### Chef Kitchen Managers

In the Jewel Food Stores, where the Chef's Kitchen Manager is assigned to the grocery department, the employees will receive the same wage increases and all applicable premiums as Chef's Kitchen Managers who are represented by UFCW Local 1546. The effective date of increases and all applicable premiums will be the same dates as increases received by employees represented by UFCW Local 881 covering Chicagoland Jewel Food Store employees.

### Health Care Waiver

Part-time employees with dependent coverage on the payroll on or before March 29, 1993 and/or part-time employees who elect dependent coverage pursuant to Section 6.2 (3)(b)(4) of the master agreement may request an hours requirement waiver from the "24 hour requirement" to maintain family coverage.

An employee may qualify for the waiver if they improve their availability to include 2 of 3 days Friday, Saturday, Sunday and be available for at least a 5 hour shift on the days they identified. Employees who improve their availability may not necessarily be scheduled additional hours. Scheduling will continue to be based upon seniority, availability and needs of the business.

### Benefit Claims Appeal/Maternity Leave

It is recognized and agreed that the claim appeal process of the Plan is the exclusive remedy for contesting any benefit claim issue. With respect to such benefit claim issues, only grievances related to an untimely processing of a properly filed benefit claim shall be recognized under the provisions of Section 9.2 (Grievance) and Section 9.3 (Arbitration).

Maternity disability periods shall remain in effect during the term of the Agreement unless the U.F.C.W. Midwest Health Benefit Plan provides for shorter maternity disability benefits.

### Over The Counter Drugs

Jewel agrees to explore the feasibility of whether certain over-the-counter drugs, when prescribed by a doctor, could be covered by the pharmacy benefit. These drugs would be OTC Prilosec and OTC Loratadine (Claritin).

### Dress Code

Under the dress code policy in effect as of July, 2006, Jewel has agreed that full-time employees shall be provided a total of four (4) uniforms and part-time employees and service clerks shall be provided a total of three (3) uniforms. Replacement of the uniforms shall be provided as needed pursuant to company policy.

20

**Security and Safety**

Jewel Food Stores and United Food and Commercial Workers Local 881, upon request of either party, agree to meet for the purpose of discussing issues regarding security and safety which impact Local 881 members employed by Jewel.

**Self Check Out Lanes (SCOT)**

We have reached an understanding concerning the installation of self-check out lanes in Jewel Food Store locations. The parties recognize that the Employer has a legitimate business objective to utilize self-check out lanes and the Union has a legitimate interest to protect the employment of current employees. Therefore, the parties agree to the following:

1)   Self-check out registers may be installed at any Jewel Food Store location as determined by Jewel.

2)   Employees of Jewel Food Stores employed as of the signing of this letter will not be laid off as a direct result of this technology implementation.

3)   If, in the event it becomes necessary to transfer employees to different departments within a store, Jewel will provide re-training necessary so the employee will be able to fulfill the requirements of the job.

4)   In the event there are no openings within the store, the Employer will transfer employees to other locations either in their current position or in a different position.

5)   In the event it becomes necessary to move employees into other departments or to re-locate employees to other stores as a result of self-check out lanes exceeding an average of 6 self-check out lanes on an overall store basis (that is 6 multiplied by the number of bargaining unit stores), the Employer will notify the Union of this development and meet with the Union, upon its request, to discuss issues related to the impact on employees as of the signing date of this letter.

**Service Clerk Duties – Bottom of Basket**

We have reached an understanding concerning service clerks using the metrologic hand held scanner for bottom of the basket items. The parties recognize that currently, checkers are not identifying and scanning items on the bottom of the basket and the Employer has a legitimate business objective to reduce shrink in its' stores caused by merchandise on the bottom of the basket not being scanned. Therefore, the parties agree to the following:

1)   It is the checker's responsibility to make sure bottom of the basket items have been scanned.

2)   To ensure that items found on the bottom of the basket are scanned, service clerks will be allowed to use the metrologic hand held scanner to scan items on the bottom of the basket.

3)   The service clerk may not scan any items other than bottom of basket items.

4)   The checker will verify that each bottom of the basket item is being scanned by watching the checker display.

5)   The checker needs to provide the service clerk a red dot for each item scanned.

6)   The service clerk needs to place a red dot on each bottom of the basket item scanned.

7)   If an item does not scan, the service clerk needs to put the item on the belt for the checker to scan.

8)   If a service clerk is not bagging for a checker, it is the checker's responsibility to scan items found on the bottom of the basket.

21

| Department Heads | 1/24/2010 | 11/27/2011 |
|---|---|---|
| Asst. Manager | | |
| 0-12 mos. | $19.30 LS | $19.60 |
| Over 12 mos. | $20.50 LS | $20.80 |
| Overscale Employees | $ 0.30 LS | $ 0.30 |
| | | |
| Produce Manager | | |
| 0-12 mos. | $19.30 LS | $19.60 |
| Over 12 mos. | $20.15 LS | $20.45 |
| Overscale Employees | $ 0.30 LS | $ 0.30 |
| | | |
| Service Manager | | |
| 0-12 mos. | $19.30 LS | $19.60 |
| Over 12 mos. | $20.15 LS | $20.45 |
| Overscale Employees | $ 0.30 LS | $ 0.30 |
| | | |
| Asst. Front End Mgr. | | |
| Asst. Service Mgr. | | |
| 0-12 mos. | $17.15 LS | $17.45 |
| Over 12 mos. | $18.75 LS | $19.05 |
| Overscale Employees | $ 0.30 LS | $ 0.30 |
| | | |
| Floral Manager | $15.25 LS | $15.55 |
| Overscale Employees | $ 0.30 LS | $ 0.30 |

LS = Lump Sum Payment

## Part-Time Regular Clerks (Hired or Promoted on or after 10/1/95)

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| 0-6 months | $8.25 | $8.25 |
| 7-12 months | $8.45 | $8.45 |
| 13-18 months | $8.65 | $8.65 |
| 19-24 months | $8.80 | $8.80 |
| 25-30 months | $9.00 | $9.00 |
| 31-36 months * Pt Cap | $10.20* LS | $10.45* |

Effective 11/27/2011, Part-time employees at the capped rate of pay shall receive the contract rate or the overscale increases, whichever is higher. Part-time employees above the capped rate of pay shall receive the overscale increases.

| Overscale Part-time clerks | $0.20 LS | $0.25 |
|---|---|---|

LS = Lump Sum Payment

## Full-Time Regular Clerks (Hired or Promoted on or after 10/1/95)

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| 0-6 months | $8.35 | $8.35 |
| 7-12 months | $8.65 | $8.65 |
| 13-18 months | $9.15 | $9.15 |
| 19-24 months | $9.65 | $9.65 |
| 25-30 months | $10.15 | $10.15 |
| 31-36 months | $10.65 | $10.65 |
| 37-42 months | $11.15 | $11.15 |
| 43-48 months | $11.15 | $11.15 |
| 49-54 months | $12.05 | $12.05 |
| 55-60 months | $12.90 | $12.90 |
| Over 60 months | $14.05 LS | $14.05 |

Effective 11/27/2011, Full-time employees at the top rate of pay shall receive the contract rate or the overscale increases, whichever is higher. Full-time employees above the top rate of pay shall receive the overscale increases.

| Overscale Full-time clerks | $0.25 LS | $0.25 |
|---|---|---|

LS = Lump Sum Payment

## Part-Time Bakery Clerks

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| 0-6 months | $8.25 | $8.25 |
| 7-12 months | $8.45 | $8.45 |
| 13-18 months | $8.65 | $8.65 |
| 19-24 months | $8.80 | $8.80 |
| 25-30 months | $9.00 | $9.00 |
| 31-36 months *Pt Cap | $10.20* LS | $10.45* |
| 37-42 months ** | | |

** at $9.70 rate on old "hired before 10/1/95" scale (37-42 months $10.50 as of 10/3/04)

Effective 11/27/2011, Part-time employees at the capped rate of pay shall receive the contract rate or the overscale increases, whichever is higher. Part-time employees above the capped rate of pay shall receive the overscale increases.

| Overscale Part-time Clerks | $0.20 LS | $0.25 |
|---|---|---|
| Red Circle | $13.35 LS | $13.60 |
| Red Circle | $14.55 LS | $14.80 |
| | $.20 LS | $ 0.25 |

LS = Lump Sum Payment

22

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| 0-6 months | $8.35 | $8.35 |
| 7-12 months | $8.55 | $8.55 |
| 13-18 months | $8.95 | $8.95 |
| 19-24 months | $8.95 | $8.95 |
| 25-30 months | $9.45 | $9.45 |
| 31-36 months | $10.20 | $10.20 |
| 37-42 months | $10.65 | $10.65 |
| Over 42 months | $12.35 LS | $12.60 |

Effective 11/27/2011, Full-time employees at or above the top rate of pay shall receive the contract rate or the overscale increases, whichever is higher. Full-time employees above the top rate of pay shall receive the overscale increases.

| | | |
|---|---|---|
| Overscale Full-time clerks | $0.25 LS | $0.25 |
| | | |
| Red Circle | $13.35 LS | $13.60 |
| Red Circle | $14.55 LS | $14.80 |
| LS = Lump Sum Payment | | |

### Floral/General Merchandise/Bulk Foods/Salad Bar Clerks

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| 0-6 months | $8.25 | $8.25 |
| 7-12 months | $8.45 | $8.45 |
| 13-18 months | $8.65 | $8.65 |
| 19-24 months | $8.80 | $8.80 |
| 25-30 months | $9.00 | $9.00 |
| 31-36 months *Pt Cap (**) | $10.00* LS | $10.25* |
| 37-42 months (***) | $10.10 LS | $10.35 |
| 43-48 months | $10.20 | $10.45 |
| Over 48 months | $11.90 LS | $12.15 |

** at $8.95 rate on old "hired Before 10/1/95" scale
*** at $9.25 rate on old "hired Before 10/1/95" scale

Effective 11/27/2011, Part-time employees at the capped rate of pay shall receive the contract rate or the overscale increases, whichever is higher. Part-time employees above the capped rate of pay shall receive the overscale increases.

| | | |
|---|---|---|
| Overscale Part-time clerks | $0.20 LS | $0.25 |
| Overscale Full-time clerks | $0.25 LS | $0.25 |

LS = Lump Sum Payment

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| 0-6 months | $8.90 | $8.90 |
| 7-12 months | $9.25 | $9.25 |
| 13-18 months | $9.65 | $9.65 |
| 19-24 months | $10.05 | $10.05 |
| 25-30 months | $10.35 | $10.35 |
| 31-36 months | $10.95 | $10.95 |
| 37-42 months *Pt Cap | $12.05* LS | $12.05* |
| Over 42 months | $13.30 LS | $13.30 |

Effective 11/27/2011, Part-time employees at or above the capped rate of pay and Full-time employees at or above the top progression rate of pay shall receive:

| | | |
|---|---|---|
| Overscale Part-time clerks | $0.20 LS | $0.25 |
| Overscale Full-time clerks | $0.25 LS | $0.25 |
| Red Circle / Part-time | $14.85 LS | $15.10 |
| Red Circle / Full-time | $14.85 LS | $15.10 |

LS = Lump Sum Payment

### Service Clerks

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| 0-6 months | $8.25 | $8.25 |
| 7-12 months | $8.25 | $8.35* |
| 13-18 months | $8.30* | $8.45* |
| Over 18 months | $8.40* LS | $8.55 |
| | | |
| Red Circle | $9.05 LS | $9.15 |
| Red Circle & Overscale | $0.10 LS | $0.10 |

* Service clerks at $8.30 or $8.40 on 11/27/2011 will move to the next highest rate of pay on the Service Clerk wage structure and thereafter progress each six (6) months through the progression. Example: Service clerk at $8.30 moves to $8.35 on 11/27/2011, then $8.45 after six (6) months, then $8.55 after next six (6) months.

LS = Lump Sum Payment

Upon promotion from Service Clerk classification, Service Clerks will go to the next higher regular clerk rate and progress accordingly. All Service Clerks hired on or after 3/22/83, will be excluded from all holidays (unless they work the holiday) and night premium pay for their first year of employment.

23

Regular Clerks (Hired or Promoted on or before 10/1/95)

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| 25-27 months  * Pt cap | $10.60* LS | $10.85* |
| 28-30 months | $11.10 | $11.35 |
| 31-36 months  ** Pt Cap | $12.10** LS | $12.35** |
| 37-42 months | $13.05 | $13.30 |
| 43-48 months | $13.40 | $13.65 |
| 49-54 months | $13.80 | $14.05 |
| Over 54 months | $14.65 LS | $14.90 |
| Overscale Part-time clerks | $0.20 LS | $ 0.25 |
| Overscale Full-time clerks | $0.25 LS | $ 0.25 |

Effective November 27, 2011, Full-time or Part-time employees at the capped rate of pay shall receive the contract rate or the overscale increases, whichever is higher. Full-time or part-time employees above the capped rate of pay shall receive the overscale increases.

| | | |
|---|---|---|
| Red Circle | $16.10 LS | $16.35 |
| Red Circle | $16.70 LS | $16.95 |
| Red Circle | $17.40 LS | $17.65 |
| Overscale Part-time clerks | $0.20 LS | $ 0.25 |
| Overscale Full-time clerka | $0.25 LS | $ 0.25 |

LS = Lump Sum Payment

Lump Sum Payment (LS):. The Lump Sum payment during 2011 will be calculated on all hours worked in the Employers payroll weeks from January 24, 2010 through November 26, 2011. To receive the Lump sum payment, an employee must be actively employed on November 26, 2011, and be at part/full-time cap or above the employee's applicable job classification based on full-time/part-time status as of November 26, 2011.

In the event the Federal or State Minimum Wage is increased during the term of this agreement, the parties shall meet and negotiate the affected wage progressions.

Employees currently in either the P.T. or F.T. wage progression (not at a capped or top rate or overscale) will carry their time in the new progression over to their new pay rate and progress accordingly.

## Jewel Food Stores Appendix A – Wage – Chicagoland – Illinois Stores

### For Employees Hired After August 11, 2006

#### Full-Time Regular Clerks

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| Start | $8.35 | $8.35 |
| 7 months | $8.65 | $8.65 |
| 13 months | $9.15 | $9.15 |
| 19 months | $9.65 | $9.65 |
| 25 months | $10.15 | $10.15 |
| 31 months | $10.65 | $10.65 |
| 37 months | $11.15 | $11.15 |
| 49 months | $11.65 | $11.65 |
| 61 months | $12.15 | $12.15 |
| 70 months | $14.05 LS | $14.05 |
| At top of scale or Overscale | $0.25 LS | $ 0.25 |

#### Part-Time Regular Clerks

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| Start | $8.25 | $8.25 |
| 7 months | $8.45 | $8.45 |
| 13 months | $8.65 | $8.65 |
| 25 months | $8.80 | $8.80 |
| 37 months | $8.95 | $8.95 |
| 49 months | $9.20 | $9.20 |
| 55 months | $9.90 | $9.90 |
| 61 months | $10.20 LS | $10.45 |
| At top of scale or Overscale | $0.20 LS | $0.25 |

#### Full-Time Bakery Clerks

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| Start | $8.35 | $8.35 |
| 7 months | $8.55 | $8.55 |
| 13 months | $8.95 | $8.95 |
| 25 months | $9.45 | $9.45 |
| 37 months | $10.05 | $10.05 |
| 49 months | $10.65 | $10.65 |
| 64 months | $12.35 LS | $12.60 |
| At top of scale or Overscale | $0.25 LS | $0.25 |

LS = Lump Sum Payment

24

In the event the Page of State Minimum Wage is increased during the term of this agreement, the parties shall meet and negotiate the affected wage progressions.

Employees currently in either the P.T. or F.T. wage progression (not at a capped or top rate or overscale) will carry their time in the new progression over to their new pay rate and progress accordingly.

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| Start | $8.25 | $8.25 |
| 7 months | $8.45 | $8.45 |
| 13 months | $8.65 | $8.65 |
| 25 months | $8.80 | $8.80 |
| 37 months | $8.95 | $8.95 |
| 49 months | $9.20 | $9.20 |
| 55 months | $9.70 | $9.70 |
| 61 months | $10.10 LS | $10.35 |
| At top of scale or Overscale | $0.20 LS | $0.25 |

### Floral/General Merchandise/Bulk Foods/Salad Bar Clerks

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| Start | $8.25 | $8.25 |
| 7 months | $8.45 | $8.45 |
| 13 months | $8.65 | $8.65 |
| 25 months | $8.80 | $8.80 |
| 37 months | $8.95 | $8.95 |
| 49 months | $9.05 | $9.05 |
| 61 months * Pt Cap | $9.90* LS | $10.15* |
| F.T. only, 70 months | $11.90 LS | $12.15 |
| At top of scale or Overscale | | |
| Part-time clerks | $0.20 LS | $0.25 |
| Full-time clerks | $0.25 LS | $0.25 |

### Service Clerks

| Months | 1/24/2010 | 11/27/2011 |
|---|---|---|
| Start | $8.25 | $8.25 |
| 7 months | $8.25 | →$8.35* |
| 13 months | $8.30* | →$8.45* |
| 25 months | $8.40* LS | $8.55 |
| At top of scale or Overscale | $0.10 LS | $0.10 |

* Service clerks at $8.30 or $8.40 on 11/27/2011 will move to the next highest rate of pay on the Service Clerk wage structure and thereafter progress each six (6) months through the progression. Example: Service Clerk at $8.30 moves to $8.35 on 11/27/2011, then $8.45 after six (6) months, then $8.55 after next six (6) months.

LS = Lump Sum Payment

Lump Sum Payment (LS): The Lump Sum payment during 2011 will be calculated on all hours worked in the Employers payroll weeks from January 24, 2010 through November 26, 2011. To receive the Lump Sum payment, an employee must be actively employed on November 26, 2011 and be at part/full-time cap or above the employee's applicable job classification based on full-time/part-time status as of November 26, 2011.

25



**UNITED FOOD and COMMERCIAL WORKERS INTERNATIONAL UNION**
10400 West Higgins Road, Suite 500, Rosemont, IL 60018 • (847) 294-5064

JEWEL FOOD STORES, INC.
CHICAGOLAND





# THORNTON POLICE DEPARTMENT
## NORBERT J. SCHLESSER, CHIEF OF POLICE
### JACK SWAN, VILLAGE PRESIDENT

700 Park Avenue • Thornton, IL 60476
Emergency 9-1-1 • Non Emergency (708) 877-2531
Administration (708) 877-4440 • Fax (708) 877-5525

February 6, 2012

To Whom It May Concern,

Pat Rupcich called on Thursday January 19, 2012 early afternoon and advised the Thornton Police Department clerk Rita Oberman that her grandson had a respiratory emergency and she was unable to cross at her corner during the afternoon scheduled crossing.

Sincerely,

Rita Oberman

EXHIBIT

C

Caroline Olaleye, M.D.     Mark L. Roome, M.D.     David S. Townsend, M.D.

## CERTIFICATE OF HEALTH

Name _Mrs. Pat Rupeich/Barbara Jacob_

has been under my care from _Jan 19th 2012_ to _____

and is able to return to work/school on _Jan 19th 2012_

Nature of illness or injury _Difficulty breathing / Wheezing_

physical education ☐ may take    ☐ limited    ☐ may not take

Dr. _____ MD    Date _1/25/12_

The University of Chicago Physicians Group
Child Life Center
19550 Governors Hwy. • Suite 2500 • Flossmoor, IL 60422 • 708-799-7600

EXHIBIT

D

# LOCAL 881 UFCW   Grievance Investigation Report

United Food and Commercial Workers International Union
10400 West Higgins Road / Rosemont, IL 60018-3705 / (847) 294-5064

| Member's Name | Social Sec. No. | Hire Date | Date Filed | Job Class Code | Grievance Number |
|---|---|---|---|---|---|
| Patricia L. Rupcich | 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 | 11/02/86 | 01/25/12 | RECV | 2012-000068 |
| 92 Indianwood | | Part/Full Time | | | Grievance Topic |
| Thornton, IL 60476 | | Full-Time | | | DE All Other |
| (708) 877-5567 . | | Work Location | | | |
| | | Jewel - 3940 E 106th St (#3139) | | | |

| Union Representative | Grievance Contact | Unit Manager | Union Steward |
|---|---|---|---|
| Marcella Robinson | Raymond Ulatowski | Raymond Ulatowski | |

| Contract: | Article: | Section: |
|---|---|---|
| JEWEL 2011 - 2013 | VIII | 8.12 |

**Grievance Details**

As we discussed on January 23, 2012 this grievance is being filed at Ms. Rupcich's request. Ms. Rupcich states that she was suspended on January 23, 2012 for an alleged violation of company policy. Therefore, it is Local 881's position that Ms. Rupcich be reinstated immediately and made whole, as it pertains to all contractual benefits to include full retro pay for all hours scheduled and not worked due to this suspension. Likewise, Local 881 requests that this discipline be removed from Ms. Rupcich's file. Further, please forward copies of all documentation used to administer this discipline to Local 881, at your earliest convenience. Please notify Local 881 as to the date Ms. Rupcich is returned to work, as well as the amount and date of retro payment.

Thank you,
Marcella Robinson
Union Representative

**Employer Response to Grievance / Local 881 Action**

**Solution / Follow Up**

| Business Representative | Date Resolved | Local President | Date | Secretary-Treasurer |
|---|---|---|---|---|
| | | | | |

## Member Copy

EXHIBIT



**Jewel**

# ASSOCIATE CORRECTIVE ACTION REVIEW

### Instructions to Managers

This form is to be used whenever you issue discipline to an hourly associate. You should make two copies of this form; place a signed copy in the employees' file; the second should be given to the individual. **NOTE:** Left click in the grey box below Date and enter the date when the Corrective Action will be issued to associate.

| Name | Associate Classification | Employment Location | Date | EMPL ID |
|------|--------------------------|---------------------|------|---------|
| Rupcich, Patricia L. | ClkFood | 3139 | 1/31/2012 | 1033087 |

➢ **Standard or Responsibility Not Being Performed Satisfactorily**

  Misappropriation of Company Property

➢ **Specific Examples of Unsatisfactory Performance**

  Patricia walked out of the store with a 25 lb. bag of bird seed alone in a shopping cart without paying for it.

➢ **"Specific Action" Needed for Improvement**

➢ **Special Circumstances (i.e. Mitigating Circumstances)**

➢ **Action Taken**

  This incident will result in: **Termination**

➢ **Warning to Associate**

  Patricia's actions are a direct violation of company policy and will result in her termination.

*REFUSED TO SIGN*
_____        _____
SIGNATURE OF ASSOCIATE                             DATE

*RAYMOND ULATOWSKI*
_____
MANAGER'S NAME (PRINT)

*[signature]*                                        *1/31/2012*
_____        _____
MANAGER'S SIGNATURE                                DATE

WITNESS:  *Mary Anzalone 1-31-2012*

Revised 11-5-10

EXHIBIT

**F**



February 21, 2012

Ms. Patricia Rupcich
92 Indianwood Drive
Thornton, IL 60476

Dear Ms. Rupcich:

Upon investigation of your grievance filed against Jewel, you are
hereby notified that the Local Union has decided not to pursue
your grievance through the final steps of arbitration.

This decision was reached based on the facts uncovered in our
investigation and numerous arbitration decisions in similar cases
where the company's position has been upheld.

However, under Article XV of the Local Union's Bylaws, you have a
right to appeal this decision. Article XV of the Local Union's
Bylaws is enclosed.

If you have any questions regarding this matter, do not hesitate
to contact me.

Sincerely,

*Steven M. Powell* /mn

Steven M. Powell
Secretary/Treasurer
UFCW Intl. Vice President

Enclosure

SMP:jmn

Cc:  Marcella Robinson
     Bill O'Keefe

EXHIBIT



**LESLIE A. MORSE, ESQ.**
60 W. SUPERIOR STREET
CHICAGO, IL 60654
(312) 654-4251

March 6, 2012

UFCW International
Attn: Local Union Executive Board
10400 W. Higgins Road
Rosemont, IL 60018-3705

**RE:    Patricia Rupcich / Jewel Employee ID #:  0001033087**

Dear Sir or Madam:

In accordance with Article VX of the Local Union's Bylaws, please be advised that my client Patricia Rupcich hereby requests a reconsideration of the Union's decision to not pursue her grievance against Jewel, as set forth in your letter of February 21, 2012.

It is my understanding that the Union's decision was based upon its review of the videotape from the Jewel store at 3940 E. 106th Street, Chicago, IL taken on Thursday, January 19, 2012.  We have not been afforded the opportunity to review the tape, but ask the Union to take the following into consideration in this decision:

    (1) Ms. Rupcich has been a dedicated employee of Jewel and the UFCW for 25 years, with an outstanding performance record and good reputation within the company.

    (2) On January 19th, she did not have the motive or intent to steal any item from Jewel.

    (3) Near the end of her workday on January 19th, Ms. Rupcich was processing damaged goods and overstock, including bags of birdseed.  She placed one 25 lb. bag of birdseed into a shopping cart in order to take it to the front of the store to turn over to Front End personnel for re-stocking, as is the standard procedure for this task.

    (4) Shortly before the end of her shift, Ms. Rupcich received a call from her daughter asking that she take her 4-year-old grandson to the doctor on an urgent basis, which she intended to do immediately after she left Jewel.

    (5) At approximately 1:00 p.m., she clocked out, gathered her personal belongings, and pushed the cart containing the overstock birdseed to the front of the store so she could finish that task before she left. Intent on attending to her grandson, Ms. Rupcich momentarily forgot she had the birdseed in the cart, and proceeded toward the front doors.

    (6) It was Ms. Rupcich's custom and practice to stop at the security guard, if one is present upfront, before leaving the store to show the receipt for any items she may have purchased and with which she was leaving the store.  On January 19th, she stopped to show the security guard her receipt for the remainder of the lunch items she was taking home.  At that time, he asked if she had a receipt for the birdseed also, whereupon she immediately realized her error, explained the situation to security, and returned the birdseed to Front End personnel for re-stocking, and left the store to pick-up her grandson.

    (7) At <u>no time</u> did Ms. Rupcich leave the store with the bag of birdseed.

EXHIBIT

**H**

UFCW
Notice of Appeal – P. Rupcich
March 6, 2012

      (8) Ms. Rupcich's activities on January 19th amount to nothing more than a brief lapse in attention, and not an attempt to steal an item of nominal value from the employer with whom she has built her career. Her only intention was to efficiently finish the last activity of her workday by taking the overstock to the front of the store while she was headed that way anyway to leave for the day, and then leave to get her grandson to the doctor.

We request that the Local Union Executive Board consider the aforesaid circumstances, as well as apply simple good sense which dictates that a career Jewel employee with a stellar performance record does not throw away a career in order to steal a bag of birdseed worth less than approximately $10.

Jewel unilaterally terminated Ms. Rupcich's employment without any consideration for her explanation. At most, this incident may have merited a much lesser degree of corrective measures.

Patricia Rupcich has consistently paid her dues to the UFCW through the years, and is now asking that they help her to fight Jewel's decision to terminate her employment.

Thank you for your reconsideration and please contact me if you need further information.

                              Very truly yours,

                              Leslie A. Morse

cc:    *Steven Powell*
       *Marcella Robinson*
       *Bill O'Keefe*



UNITED FOOD and COMMERCIAL WORKERS INTERNATIONAL UNION
10400 W. HIGGINS RD., SUITE 600 / ROSEMONT, ILLINOIS 60018-3714
Phone (847)365-3085 / Fax (847)708-7108 / www.local881UFCW.org

April 11, 2012

Ms. Patricia L. Rupcich
92 Indianwood
Thornton, IL  60476

Dear Patricia:

The Executive Board of Local 881 met on Tuesday, April 10, 2012.

The appeal of the decision not to proceed with your grievance was presented to the Board and thoroughly discussed at that time.

The Executive Board determined that your grievance lacked merit in arbitration and denied your appeal. Accordingly, this matter is now closed.

Sincerely,

Ronald E. Powell
President, Local 881 and
International Vice President

REP:sfg

EXHIBIT

I

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PATRICIA RUPCICH,                          )
                     Plaintiff,          )
     v.                                   )
                           )          Case No. 12-cv-6615
UNITED FOOD AND COMMERICAL             )
WORKERS INTERNATIONAL UNION,           )          Judge John Z. Lee
LOCAL 881, and JEWEL FOOD STORES,      )
INC.,                                  )
                Defendants.       )
                           )

## DEFENDANT'S ANSWER AND AFFIRMATIVE
## DEFENSES TO PLAINTIFF'S COMPLAINT

Defendant Jewel Food Stores, Inc. by its attorneys, hereby submits its Answer and

Affirmative Defenses to the Complaint of Plaintiff Patricia Rupcich.

### Nature of Action

1.     This action arises out of a violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce, pursuant to 29 U.S.C.A. § 185; *see also Vaca v. Sipes*, 87 S.Ct. 903 (1967).

**ANSWER:**     Jewel admits that Plaintiff has alleged a violation of a contract between an

employer and a labor organization pursuant to Section 301 of the Labor Management Relations

Act, but denies that Jewel has violated any law and denies that Plaintiff is entitled to any relief

under this statute.  Jewel denies any remaining allegations in Paragraph 1.

### Jurisdiction and Venue

2.     Venue lies in the Northern District of Illinois in that the Plaintiff is a citizen of Illinois, Plaintiff is a resident of this District, and the Defendants are doing business in this District. In addition, the Defendant United Food and Commercial Workers International Union, Local 881's duly authorized officers or agents are engaged in representing or acting for its employee members in this District.

**EXHIBIT**

**J**

**ANSWER:** Jewel lacks knowledge or information sufficient to form belief about the alleged citizenship of Plaintiff. Jewel admits the remaining allegations in Paragraph 2, and admits that venue is proper in the Northern District of Illinois.

     3.     This action arises out of a violation of contracts pursuant to 29 U.S.C.A. § 185, of which a copy of the Collective Bargaining Agreement entitled Local 881 UFCW Contract 2010-2013, Jewel Food Stores, Inc. Chicagoland, is attached and incorporated herein as Exhibit A.

**ANSWER:** Jewel admits that Plaintiff has alleged a violation of a contract pursuant to Section 301 of the Labor Management Relations Act, and has attached a copy of the collective bargaining agreement between Jewel and Local 881 of the UFCW as Exhibit A to her Complaint. Jewel denies that it has violated any law and denies the remaining allegations in Paragraph 3.

## Jury Demand

     4.     Plaintiff demands a trial by jury.

**ANSWER:** Jewel admits that Plaintiff has demanded a jury trial.

## Parties

     5.     Plaintiff is an individual residing in Thornton, Illinois and began employment with Defendant Jewel Food Stores, Inc. (hereinafter "Jewel") on November 2, 1986.

**ANSWER:** Jewel lacks knowledge or information sufficient to form a belief regarding Plaintiff's residence. Jewel admits that Plaintiff began employment with Jewel on November 2, 1986.

     6.     Jewel is a foreign corporation, incorporated in the State of Ohio and doing business in the State of Illinois.

**ANSWER:** Jewel admits the allegations in Paragraph 6.

     7.     Jewel is a wholly owned subsidiary of the Defendant Supervalu Inc. (hereinafter "Supervalu"), which is a Delaware corporation doing business in the State of Illinois.

**ANSWER:** Jewel admits that it is a wholly owned subsidiary of SUPERVALU, INC., and

that SUPERVALU is a Delaware corporation doing business in the State of Illinois. Jewel

denies that SUPERVALU is a defendant in this case.

      8.    Defendant United Food and Commercial Workers International Union, Local 881 (hereinafter "UFCW 881") is a union labor organization, doing business within and representing its members within the District.

**ANSWER:** Jewel admits the allegations in Paragraph 8.

      9.    At all times relevant, Plaintiff was a member in good standing of UFCW 881.

**ANSWER:** Jewel lacks knowledge or information sufficient to form a belief regarding the

truth of the allegations in Paragraph 9.

      10.    Plaintiff began employment with Jewel on November 2, 1986. Her performance reviews have always been very good and she had previously believed that she was a valued employee of Jewel.

**ANSWER:** Jewel admits that Plaintiff began her employment with Jewel on November 2,

1986. Jewel lacks knowledge or information sufficient to form a belief regarding the truth of

what Plaintiff "believed" and denies the remaining allegations in Paragraph 10.

      11.    On or about January 19, 2012, Plaintiff was employed as a receiving clerk by Jewel at its store located at 3940 E. 106th Street, Chicago, Illinois (Store #3139).

**ANSWER:** Jewel admits the allegations in Paragraph 11.

      12.    On or about January 19, 2012, shortly prior to the end of her work shift at the aforesaid store, Plaintiff received an urgent call from her daughter that Plaintiff's four-year-old grandson was having difficulty breathing and requested Plaintiff to take him immediately to the doctor.

**ANSWER:** Jewel lacks knowledge or information sufficient to form a belief regarding the

truth of the allegations in Paragraph 12.

      13.    At the time she received the urgent call from her daughter, Plaintiff was processing damaged goods and misplaced product, including bags of birdseed.

3

**ANSWER:** Jewel lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 13.

14. Just prior to receiving the call, Plaintiff had placed a 25-pound bag of overstock birdseed into a shopping cart in order to take it to the self-checkout stand located near the front of the store so other employees would subsequently return the birdseed to the shelves.

**ANSWER:** Jewel lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 14.

15. Jewel was aware that in performing her job duties, Plaintiff would often be required to take product that was to be re-shelved to the self-checkout stand, which is past the point of sale yet still inside the store.

**ANSWER:** Jewel denies the allegations in Paragraph 15.

16. In a rush due to the medical emergency of her grandson, Plaintiff gathered her personal items and her unfinished lunch and placed them in the child-seat portion of the cart. The bag of birdseed was in the basket of the cart, which was open and visible to anyone.

**ANSWER:** Jewel admits that Plaintiff placed some items in the child-seat portion of a shopping cart and that a bag of birdseed was in the basket of the cart. Jewel lacks knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegation that she was in a rush due to a medical emergency of her grandson. Jewel denies the remaining allegations in Paragraph 16.

17. As was Plaintiff's normal custom and practice, she stopped at the security guard who was standing at the door inside the store and showed him the receipt for her lunch. When the security guard asked Plaintiff about a receipt for the birdseed, Plaintiff realized that she had not left the cart in the front of the self-checkout stand but then did so immediately. The self-checkout stand is inside the store and is approximately three feet or less from where she stood with the security guard.

**ANSWER:** Jewel admits that, as Plaintiff was exiting the store, she stopped by the security guard and showed him what appeared to be a receipt. Jewel further admits that after being stopped by the security guard, she returned the cart to the front of the self-checkout. Jewel denies the remaining allegations in Paragraph 17.

4

18. A photograph taken of the area where Plaintiff stopped by the security guard is attached hereto and incorporated herein as Exhibit B. The Jewel employee in the photograph is standing at the same self-checkout stand where Plaintiff would often place product to be re-shelved and also where she placed the shopping cart with the birdseed.

**ANSWER:** Jewel admits that Plaintiff has attached a copy of a photograph as Exhibit B to her

Complaint, but lacks knowledge or information sufficient to form a belief regarding the contents

or authenticity of the photograph, in part due to the image quality of the attachment. Jewel

denies the remaining allegations in Paragraph 18.

19. Plaintiff then immediately left the Jewel Store, and took her grandson to the doctor's office. Due to the medical emergency, Plaintiff was also unable to work at her regularly-scheduled shift as a crossing guard for the Thornton Police Department. A copy of the note from the Thornton Police Department and a note from her grandson's doctor are attached hereto and incorporated herein as Exhibits C and D, respectively.

**ANSWER:** Jewel admits that Plaintiff left the store, but lacks knowledge or information

sufficient to form a belief regarding the truth of Plaintiff's allegation concerning her actions after

she left the store. Jewel further admits that Plaintiff has attached documents as Exhibits C and D

to her Complaint, which she purports to be a note from the Thornton Police Department and a

note from her grandson's doctor. Jewel denies the remaining allegations in Paragraph 19.

20. Plaintiff continued to work at her job the following day, which was a Friday, on Saturday, and on Monday as well.

**ANSWER:** Jewel admits the allegations in Paragraph 20.

21. On January 23, 2012, during Plaintiffs normal work shift, she was requested to come to the manager's office. In the office was the head of security for the store who asked her to write out a statement as to what happened on January 19, 2012. Plaintiff believed the January 19, 2012 incident to be a non-issue. Shortly thereafter, the head of security advised Plaintiff that she was suspended until further notice or until they completed their investigation. Plaintiff was told by the Jewel Manager that there was a videotape of Plaintiff in the store. When Plaintiff requested to see the videotape, she was refused. However, Plaintiff was told her union representative could obtain the videotape.

**ANSWER:** Jewel admits that, on January 23, 2012, during Plaintiff's work shift, she was

requested to come to the manager's office. Jewel further admits that, in the office, a loss

5

prevention manager gave Plaintiff an opportunity to write a statement as to what happened from her perspective. Jewel further admits that Plaintiff was advised that she was suspended until further notice pending further investigation. Jewel further admits that Plaintiff was informed that there existed a video of Plaintiff in the store, and that Plaintiff was told that her union representative could request the video. Jewel denies the remaining allegations in Paragraph 21.

22. On January 23, 2012, after the meeting in the manager's office Plaintiff called her union representative at UFCW 881, Marcella Robinson. Plaintiff told Ms. Robinson what happened at the meeting in the manager's office and that Plaintiff had been suspended. Ms. Robinson said she would file a grievance regarding the suspension and to contact her if Jewel asked Plaintiff to come back to the store.

**ANSWER:** Jewel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22.

23. The UFCW 881 filed a grievance on January 25, 2012. A copy of the Grievance Investigation Report is attached hereto and incorporated herein as Exhibit E.

**ANSWER:** Jewel admits the allegations in Paragraph 23.

24. On January 28, 2012, Plaintiff was contacted by one of the store co-managers, who requested that Plaintiff come to the store. Plaintiff contacted Ms. Robinson and a meeting was scheduled for January 31, 2012.

**ANSWER:** Jewel admits that on or about January 28, one of the store managers contacted Plaintiff and requested her to come to the store and that a meeting was scheduled for January 31, 2012. Jewel lacks knowledge or information sufficient to form a belief as to whether Plaintiff contacted Marcella Robinson.

25. On January 31, 2012, Plaintiff and Ms. Robinson came to the store manager's office. In the office was the acting store manager. Plaintiff was given a document entitled "Associate Corrective Action Review" and told to sign the document. A copy of the "Associate Corrective Action Review" is attached hereto and incorporated herein as Exhibit F.

**ANSWER:** Jewel admits that on January 31, 2012, Plaintiff and Ms. Robinson came to the store manager's office for a meeting, where a store manager was present. Jewel further admits

6

that Plaintiff was given a document entitled "Associate Corrective Action Review," and was

offered an opportunity to sign the document. Defendant further admits that Plaintiff attached a

copy of the Associate Corrective Action Review as Exhibit F to the Complaint. Defendant

denies the remaining allegations in Paragraph 25.

26.     The "Associate Corrective Action Review" contains false statements of fact.
Plaintiff did not misappropriate company property. Plaintiff did not walk out of the store with a
25-pound bag of birdseed alone in a shopping cart without paying for it.

**ANSWER:**     Jewel denies the allegations in Paragraph 26.

27.     The "Associate Corrective Action Review" also omits relevant information.
Under "Special Circumstances," nothing is stated regarding the urgent medical attention required
by her grandson. Plaintiff left the birdseed at the self-checkout stand where she has customarily
left other product to be re-shelved.

**ANSWER:**     Jewel denies the allegations in Paragraph 27.

28.     Because the "Associate Corrective Action Review" contains false statements of
fact and omissions of relevant information, Plaintiff refused to sign the document.

**ANSWER:**     Jewel denies the allegations in Paragraph 28.

29.     At the January 31, 2012 meeting, Plaintiff was then terminated immediately.
Plaintiff's termination was based upon the "Associate Corrective Action Review."

**ANSWER:**     Jewel admits that Plaintiff was informed that she was terminated at a meeting on

January 31, 2012 for reasons stated in the Associate Corrective Action Review. Jewel denies the

remaining allegations in Paragraph 29.

30.     On January 31, 2012, after being terminated, Plaintiff requested that her union
representative at UFCW 881, Ms. Robinson, file a grievance regarding her termination. Ms.
Robinson told Plaintiff that she would consult with her supervisor and get back to Plaintiff if
something more could be done.

**ANSWER:**     Jewel lacks knowledge or information sufficient to form a belief regarding the

truth of the allegations in Paragraph 30.

852365.1

31.    In or about mid-February 2012, Plaintiff received a call from her union representative at UFCW 881, Ms. Robinson. Ms. Robinson advised Plaintiff that the grievance had been denied and that UFCW 881 was not going to do anything further.

**ANSWER:**    Jewel lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 31.

32.    On or about February 21, 2012, Plaintiff received a letter from her UFCW 881 stating that UFCW 881 was not going to pursue her grievance through arbitration. A copy of the February 21, 2012 letter is attached hereto and incorporated herein as Exhibit G.

**ANSWER:**    Jewel lacks knowledge or information sufficient to form a belief regarding the truth of the allegation that she received a letter from her union on or about February 21, 2012, or the contents of the letter. Jewel admits that Plaintiff has attached a document as Exhibit G to her Complaint, which she purports to be a letter she received from her union dated February 21, 2012. Jewel denies the remaining allegations Paragraph 32.

33.    On or about March 6, 2012, Plaintiff, through her attorney, Leslie A. Morse, sent a written request for appeal and reconsideration of UFCW 881's decision not to proceed with arbitration. A copy of the appeal letter is attached hereto and incorporated herein as Exhibit H.

**ANSWER:**    Jewel lacks knowledge or information sufficient to form a belief regarding the truth of the allegation that her attorney sent a letter to her union on or about March 6, 2012, or the contents of the letter. Jewel admits that Plaintiff has attached a document as Exhibit H to her Complaint, which she purports to be a letter her attorney sent to her union. Jewel denies the remaining allegations in Paragraph 33.

34.    On or about April 11, 2012, Plaintiff received a letter from UFCW 881 stating that that the Executive Board denied Plaintiff's appeal because her "grievance lacked merit in arbitration." UFCW 881 then closed the matter. A copy of the April 11, 2012 letter is attached hereto and incorporated herein as Exhibit I.

**ANSWER:**    Jewel lacks knowledge or information sufficient to form a belief regarding the truth of the allegation that she received a letter from her union on or about April 11, 2012, the contents of the letter, or whether the union closed the matter after the letter was allegedly sent.

8

Jewel admits that Plaintiff has attached a document as Exhibit 1 to her Complaint, which she purports to be a letter she received from her union dated April 11, 2012. Jewel denies the remaining allegations in Paragraph 34.

35. In or about August of 2012, Plaintiff learned that her union representative at UFCW 881, Ms. Robinson, viewed a videotape that definitively shows that Plaintiff did not leave the store with a 25-pound bag of birdseed.

**ANSWER:** Jewel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35.

### Count I: Breach of UFCW 881's Duty of Fair Representation

36. Plaintiff adopts and re-alleges paragraphs 1-35 of this Complaint into this Count I.

**ANSWER:** Jewel restates and incorporates its answers to Paragraphs 1 through 36 as though fully set forth herein.

37. At all times relevant, UFCW 881 had a duty to fairly represent each of its members, including Plaintiff.

**ANSWER:** Jewel admits the allegations in Paragraph 37.

38. UFCW 881 breached its duty to fairly represent Plaintiff by the following acts and omissions:

    a.    Failed to serve upon Jewel and/or Supervalu a written demand for arbitration where it was aware that Plaintiff's termination was based upon false facts and omission of relevant important information;

    b.    Failed to serve upon the Defendants Employer a written demand for arbitration where there was no just cause to suspend or terminate

    c.    Failed to serve upon Jewel and/or Supervalu a written demand for arbitration where the Jewel and/or Supervalu breached the Collective Bargaining Agreement by suspending and terminating Plaintiff from her employment;

    d.    Failed to use videotape evidence that would conclusively show that Plaintiff did not leave the store with birdseed, as falsely stated in the "Associate Corrective Action Review";

    e.    Allowed Plaintiff to be terminated based on facts that UFCW 881 was aware were false;

    f.    Allowed Plaintiff to be falsely accused of misconduct when UFCW 881 was aware of facts and information to the contrary;

    g.    Failed to adequately conduct an investigation, as required, that would have demonstrated that the facts that premised the termination of Plaintiff were false;

h.  Irrationally, arbitrarily, and incompetently failed to address the false facts and missing relevant information on the "Associate Corrective Action Review," which was the alleged basis for the suspension and termination of Plaintiff's employment by Jewel and/or Supervalu; and

i.  Failed to adequately and competently represent Plaintiff throughout the grievance procedure as provided in the Local 881 UFCW Contract 2010 2013, Jewel Food Stores, Inc. Chicagoland.

**ANSWER:**   Jewel denies the allegations in Paragraph 38.

39.   The representation of Plaintiff by the UFCW 881 was inadequate, negligent, arbitrary, and irrational and has caused severe harm to the career and well-being of the Plaintiff.

**ANSWER:**   Jewel denies the allegations in Paragraph 39.

40.   By its refusal to take any further action regarding Plaintiff suspension and termination of employment, including but not limited to a written demand for arbitration, UFCW 881 improperly, arbitrarily, and irrationally precluded Plaintiff from asserting her rights under the contract and common law to redress the breach of contract and wrongful termination by Jewel and/or Supervalu.

**ANSWER:**   Jewel denies the allegations in Paragraph 40.

## Count II: Breach of Contract and Wrongful Termination

41.   Plaintiff adopts and re-alleges paragraphs 1-35 of this Complaint into this Count II.

**ANSWER:**   Jewel restates and incorporates its answers to Paragraphs 1 through 35 as though fully set forth herein.

42.   Jewel and Supervalu breached their contract with UFCW 881 and Plaintiff by the following acts and omissions:

a.  Suspended and terminated the employment of Plaintiff without just cause;

b.  Suspended and terminated the employment of Plaintiff based on false facts and missing relevant information;

c.  Failed to adequately investigate the facts and circumstances prior to suspending and terminating the employment of Plaintiff;

d.  Failed to follow the grievance procedures and provided in the Local 881 UFCW Contract 2010-201.3, Jewel Food Stores, Inc. Chicagoland;

e.  Wrongfully suspended and terminated the employment of Plaintiff;

f.  Failed to allow Plaintiff to adequately address the false facts and allegations contained in "Associate Corrective Action Review," which was the alleged basis for the suspension and termination of Plaintiff's employment; and

10

g.  Suspended and terminated the employment of Plaintiff based upon false facts and missing relevant information in the document "Associate Corrective Action Review."

**ANSWER:**  Jewel denies the allegations in Paragraph 42.

## AFFIRMATIVE DEFENSES

1.  Plaintiff's claim is barred because she failed to exhaust the grievance and arbitration procedures in the applicable collective bargaining agreement.

2.  Plaintiff's claim for breach of the collective bargaining agreement against Jewel is barred because Plaintiff cannot prove that the Union violated its duty of fair representation towards her.

3.  Plaintiff failed to adequately mitigate her damages and therefore, any relief is barred.  Moreover, any relief obtained by Plaintiff must be reduced by her earnings, compensation and benefits during the relevant time period.

4.  The injuries alleged and damages sought by Plaintiff were caused by her own actions.

Defendant expressly reserves the right to rely upon any additional defenses that may became available or apparent during the proceedings in this matter and hereby reserved its right to amend its answer and assert any such defenses.

WHEREFORE, Defendant Jewel Food Stores, Inc. respectfully requests that the Complaint be dismissed in its entirety, with prejudice.

Respectfully submitted,

JEWEL FOOD STORES, INC.

s/ Abizer Zanzi

Dated: October 16, 2012     One of Its Attorneys

11

852365.1

Michael A. Warner, Jr.
Abizer Zanzi
FRANCZEK RADELET P.C.
300 South Wacker Drive, Suite 3400
Chicago, Illinois 60606
(312) 986-0300

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused a true and correct copy of the

foregoing **Defendant's Answer and Affirmative Defenses to Plaintiff's Complaint** to be

served on the individual below by filing the foregoing electronically using the CM/ECF filing

system on this 16th day of October, 2012:

> Neal C. Zazove
> Franklin Z. Wolf
> Neal C. Zazove & Associates, P.C.
> 19 South LaSalle St., Ste. 1200
> Chicago, Illinois 60603

s/ Abizer Zanzi
Abizer Zanzi

FRANCZEK RADELET P.C.
300 South Wacker Drive, Suite 3400
Chicago, Illinois 60606
(312) 986-0300

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| PATRICIA RUPCICH, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 12-cv-6615 |
| UNITED FOOD AND COMMERICAL | ) |
| WORKERS INTERNATIONAL UNION, | ) Judge John Z. Lee |
| LOCAL 881, and JEWEL FOOD STORES, | ) |
| INC., | ) |
| Defendants. | ) |
| | ) |

## DEFENDANT JEWEL FOOD STORES INC.'S
## ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant Jewel Food Stores, Inc., by its attorneys, responds to Plaintiff Patricia Rupcich's First Set of Interrogatories as follows:

## GENERAL OBJECTIONS

Defendant objects to the Definitions and Instructions set forth in Plaintiff's First Set of Interrogatories to the extent that they conflict with or impose obligations beyond those imposed by the Federal Rules of Civil Procedure or with the Local Rules of the Northern District of Illinois. Defendant further objects to Plaintiff's First Set of Interrogatories to the extent that they: (1) seek information that is equally available to Plaintiff; (2) seek confidential personal information regarding individuals who are not parties to this lawsuit; (3) seek information that is protected by the attorney-client and/or work product privileges; or (4) require any infringement of the attorney-client or attorney work product privileges.

All answers are made subject to and without waiving these general objections as well as the specific objections referenced below. Furthermore, Defendant's investigation of this matter is continuing and all answers are given without prejudice to its right to supplement or amend its answers based on information discovered after the date on which they are served.

EXHIBIT
K

## OBJECTIONS AND RESPONSES

1.    With respect to the individual answering these interrogatories on behalf of the Defendant Jewel Food Stores, Inc., please state your name, business address and the title held with the Defendant.

**ANSWER:** Defendant states that Tim O'Connor (Associate Relations Manager) signed and verified Defendant's Answers to Plaintiff's First Set of Interrogatories, which were prepared with the assistance of counsel. Mr. O'Connor may be contacted through counsel.

2.    Please identify all persons who had supervisory responsibility of the Plaintiff from 2007 to Plaintiff's last day of employment with Defendant Jewel and state:
    a.    Their name, address and title;
    b.    The length of time employed by Defendant;
    c.    The period of time they had supervisory responsibility for the Plaintiff.

**ANSWER:** Defendant objects to this request as overbroad in its temporal scope, unduly burdensome, and not reasonably calculated to the discovery of admissible evidence to the extent it seeks information regarding employees who supervised Plaintiff outside of Store 3139. Subject to and without waiving its objections, Defendant states that the following Jewel employees had supervisory authority over Plaintiff from while she was employed at Store 3139: (a) Bernard Benson, Assistant Store Director, employed at Store 3139 from October 1973 to present; (b) Ken Kostro, Store Director, employed by Defendant from September 1978 to March 2010, worked at Store 3139 from March 2007 to March 2010; (c) William Caray, Store Director, employed by Defendant from September 1979 to December 2010, worked at Store 3139 from March 2010 to December 2010; (d) Tim Kearney, Store Director, employed by Defendant from September 1984 to present, worked at Store 3139 from March 2011 to April 2011; (e) Alan Kropiewnicki, Store Director, employed by Defendant from August 1976 to present, worked at Store 3139 from April 2011 to December 2011; and (f) Raymond Ulatowski, Assistant Store Director, employed by Defendant from October 2003 to present, transferred to Store 3139 on December 11, 2011.

3.     Identify each and every witness, including parties known to you, or any agent or employee of yours to have seen, heard, or known about each incident or occurrence alleged in the complaint. For each person state:
    a.     Their name, title and address;
    b.     The substance of what knowledge the person has; and
    c.     Whether or not the witness gave any statement, either orally or in writing; and if in writing who has possession of the statement;
    d.     Whether or not any notes were taken by anyone during the statement;
    e.     Identify each person who took notes during the statement; and
    f.     Identify each person has possession of the notes taken during the statement.

**ANSWER:** Defendant objects to the phrase "each incident or occurrence" as vague and

ambiguous. Subject to and without waiving its objections, and pursuant to Federal Rule of Civil

Procedure 33(d), Defendant refers its Associate Relations and Loss Prevention investigation files

relating to the events of January 19, 2012, which contain responsive information and which are

produced in response to Plaintiff's First Request for Production.

4.     State each reason that Defendant Jewel terminated the employment of Plaintiff. For each reason, identify each individual involved in making the decision to terminate the employment of Plaintiff with Jewel.

**ANSWER:** Plaintiff was terminated for misappropriation of company property. John Novosel,

Associate Relations Representative, made the decision to terminate Plaintiff based on

information and input received from store management and loss prevention personnel.

5.     Does Jewel contend that Plaintiff "walked out of the store with a 25 lb. bag of bird seed alone in a shopping cart without paying for it?" If so, state precisely where Plaintiff was in relation to the exterior of the premises where Jewel first observed that Plaintiff was "out of the store" with a 25 lb. bag of bird seed.

**ANSWER:** Defendant's investigation of the events January 19, 2012 resulted in a determination

that Plaintiff walked past the point of sale with unpaid merchandise, which Defendant considered

walking out of the store with unpaid merchandise for purposes of concluding that Plaintiff

misappropriated merchandise.

6.     Identify each individual who observed that Plaintiff "walked out of the store with a 25lb bag of bird seed alone in a shopping cart without paying for it."

**ANSWER:** Gregory Young, Loss Prevention observed the incident and reported it. Other

individuals unknown to Jewel may also have observed the incident.

7.    Does Defendant Jewel have photographs, a video or any other recording of the January 19, 2012, incident alleged in Plaintiff's complaint? If so, identify who has possession of the photographs, video or recording. In addition, please make a copy available to Plaintiff.

**ANSWER:** Pursuant to Federal Rule of Civil Procedure 33(d), Defendant refers to photographs

and videos in its possession, which are produced in response to Plaintiff's First Request for

Production.

8.    Does Jewel contend that Plaintiff concealed a 25 lb. bag of bird seed?

**ANSWER:** Defendant determined that Plaintiff placed her coat over a 25 lb. bag of bird seed

that she had in her possession as she was leaving the store.

9.    Does Jewel contend that Plaintiff consumed any or all of a 25 lb bag of bird seed?

**ANSWER:** No.

10.    Please state all definitions used by Defendant Jewel Food Stores, Inc. of the term "misappropriation of company property" and the source of each definition Jewel used.

**ANSWER:** Pursuant to Federal Rule of Civil Procedure 33(d), Defendant refers to its Associate

Policy Handbook and applicable Collective Bargaining Agreement, which contains the

information requested, and which is produced in response to Plaintiff's First Request for

Production.

11.    Please identify all persons and/or individuals who participated in each and every grievance conference regarding Plaintiff's grievance.

**ANSWER:** Defendant states that Raymond Ulatowski, Marcella Robinson and Plaintiff

participated in Plaintiff's grievance conference.

12.    Please identify all individuals who participated in the investigation of Plaintiff's grievance.

**ANSWER:** Pursuant to Federal Rule of Civil Procedure 33(d), Defendant refers to its Associate

Relations and Loss Prevention files relating to the events of January 19, 2012, which contain the

information requested, and which are produced in response to Plaintiff's First Request for

Production.

13. State Plaintiff's rate of pay and all other benefits of employment Plaintiff received from Defendant Jewel prior to her termination of employment by Jewel.

**ANSWER:** Plaintiff's wage rate at the time of her termination was $15.70 per hour. Pursuant to

Federal Rule of Civil Procedure 33(d), Defendant further refers to Plaintiff's personnel files,

which contain responsive information, and which are produced in response to Plaintiff's First

Request for Production.

14. Please identify each individual who participated in the decision to terminate Plaintiff's employment with Jewel.

**ANSWER:** See Answer to Interrogatory No. 4.

15. For each and every investigation of Plaintiff's grievance, state with specificity the method(s) or procedure(s) utilized in the investigation.

**ANSWER:** Pursuant to Federal Rule of Civil Procedure 33(d), Defendant refers to its Associate

Relations and Loss Prevention files relating to the events of January 19, 2012, which contain

responsive information, and which are produced in response to Plaintiff's First Request for

Production.

16. For each investigation of Plaintiff's grievance, state the date of each investigation, each individual performing the investigation and the results of each investigation.

**ANSWER:** Pursuant to Federal Rule of Civil Procedure 33(d), Defendant refers to its Associate

Relations and Loss Prevention files relating to the events of January 19, 2012, which contain

responsive information, and which are produced in response to Plaintiff's First Request for

Production.

19.     Identify each individual who replaced Plaintiff at her job at the Jewel Store or assumed Plaintiff's job responsibilities.  For each individual, state their name, title, the duties they assumed and the number of hours they work per week.

**ANSWER:** Defendant objects to this request as not reasonably calculated to the discovery of admissible evidence.  Subject to and without waiving its objections, Defendant states that Cherie Ann Livingston assumed Plaintiff's job responsibilities after her termination.

20.     State each fact upon which Jewel bases its affirmative defense that Plaintiff failed to exhaust the grievance and arbitration procedures in the applicable bargaining agreement.

**ANSWER:** Plaintiff did not, through her union representative, pursue her grievance beyond the Step One phase pursuant to the terms of her union contact.

21.     State each fact upon which Jewel bases its affirmative defense that Plaintiff failed to adequately mitigate her damages.

**ANSWER:** Investigation continues and Jewel anticipates that information requested from Plaintiff in discovery will establish this defense.

22.     State each fact upon which Jewel bases its affirmative defense that the injuries alleged and damages sought by Plaintiff were caused by her own actions.

**ANSWER:** Defendant states that Plaintiff was terminated for cause based on her actions on January 19, 2012.  Pursuant to Federal Rule of Civil Procedure 33(d), Defendant further refers to its Associate Relations and Loss Prevention files relating to the events of January 19, 2012, which contain responsive information, and which are produced in response to Plaintiff's First Request for Production.

23.     Does Jewel believe that Plaintiff purposely intended to leave the Jewel store with a 25 lb. bag of bird seed?  If yes, please state all facts upon which Jewel bases its belief.

**ANSWER:** Defendant objects to this request as not reasonably calculated to the discovery of admissible evidence.  Subject to and without waiving its objections, Defendant states that it has

no knowledge whether Plaintiff purposefully intended to the leave the store with a 25 lb. bag of bird seed, but Plaintiff's course of conduct on the date in question suggested that she did.

Respectfully submitted,

JEWEL FOOD STORES, INC.

By: _____
One of Its Attorneys

Michael A. Warner, Jr.
Abizer Zanzi
FRANCZEK RADELET P.C.
300 South Wacker Drive, Suite 3400
Chicago, Illinois 60606-6785
(312) 986-0300

Dated: December 4, 2012

879951.1

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused a true and correct copy of the

foregoing Defendant's Answers to Plaintiff's First Set of Interrogatories to be served upon the

following counsel of record this 4th day of December, 2012 by Overnight Mail to:

> Neal C. Zazove
> Franklin Z. Wolf
> Neal C. Zazove & Associates, P.C.
> 19 South LaSalle St., Ste. 1200
> Chicago, Illinois 60603

and by First Class U.S. Mail to:

> Jonathan D. Karmel
> Alexander C. Barney
> The Karmel Law Firm
> 221 North LaSalle Street, Suite 1307
> Chicago, IL 60601
> (312) 641-2910

Abizer Zanzi

879951.1

## VERIFICATION

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing statements are true and correct.

Name: _Tim O'Connor_

Title: _Associate Relations Manager_

Date: _November 26, 2012_

827808.1